**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 1998**

**PATRICK FISHER**
**Clerk**

PUBLISH

## UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

DOUGLAS S. MEYER,

    Plaintiff-Counter-Defendant-
Appellant,

v.

JAY CONLON, individually, and
NATIONAL FARMERS UNION
PROPERTY & CASUALTY
COMPANY, a foreign corporation,

    Defendants-Appellees,

RAIN AND HAIL INSURANCE
SERVICE, INC., an Iowa corporation,

    Defendant-Counter-Claimant-
Appellee.

No. 97-8028

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 95-CV-170-J)

Thomas D. Birge of Birge & Mayers, P.C., Denver, Colorado, for Plaintiff-
Appellant.

Loyd E. Smith of Murane & Bostwick, L.L.C., Cheyenne, Wyoming, for
Defendants-Appellees.

Before **BRORBY** , **KELLY** , and **HENRY** , Circuit Judges.

**PER CURIAM** .

After Rain and Hail refused to pay Douglas S. Meyer's crop insurance claim, he sued, under diversity jurisdiction in federal court, Rain and Hail, National Farmers Union (Rain and Hail's parent company), and Jay Conlon (a Rain and Hail agent). The defendants moved for summary judgment, asserting that federal statutes preempted Mr. Meyer's state law claims and, in the alternative, that they were entitled to summary judgment on the merits. The district court rejected their preemption argument but granted their summary judgment motion on the merits. See Meyer v. National Farmers Union Prop. & Cas. Co., 957 F. Supp. 1492 (D. Wyo. 1997). Mr. Meyer appeals, and we affirm.

## I. BACKGROUND

The Federal Crop Insurance Act ("FCIA") established the Federal Crop Insurance Corporation ("FCIC") to encourage farmers to purchase multiple peril crop insurance,[1] which protects farmers against loss from natural disasters, such

---

[1] Our opinion in State of Kansas ex rel. Todd v. United States , 995 F.2d 1505, 1507-08 (10th Cir. 1993), provides a more detailed discussion of the history and purpose of the FCIA.

as hail and disease. To achieve this goal–and in lieu of setting up a government bureaucracy to process claims–the FCIC makes crop insurance available three ways: (1) licensed private insurance agents and brokers sell policies issued directly by the FCIC; (2) the FCIC reinsures private insurers that issue crop insurance policies, with the FCIC paying the private insurance companies' operating and administrative costs for the reinsured policies; and (3) county offices of the Agricultural Stabilization and Conservation Service provide the insurance directly to farmers. Mr. Meyer acquired his crop insurance through the second method; Rain and Hail sold him the policy and was reinsured by the FCIC.

A crop insurance policy sets a per acre crop production guarantee and pays the farmer for any difference between the guaranteed yield and the actual amount the farmer harvests. The per acre crop production guarantee is set by (a) considering the past production of the particular farmer or, (b) if there are no adequate past production records, using a formula provided by regulation. The terms of the insurance policy must be fixed by a certain date, which is set by regulation, and the farmer pays the policy premium after the farmer brings the crop to market. Paying the premium after the crop is sold creates the unusual contractual situation in which the farmer has insurance before he has paid his premium.

On April 13, 1994, Mr. Meyer, a Wyoming resident, applied to Rain and

Hail for crop insurance to cover his bean crop. The parties dispute at what amount per acre Rain and Hail actually guaranteed Mr. Meyer's bean crop, but no evidence suggests that it was at more than 999 pounds per acre.

On June 22, 1994, Mr. Meyer's crop was damaged by hail. Mr. Meyer notified Rain and Hail of the hail damage, and, on June 29, an adjuster from Rain and Hail came to assess Mr. Meyer's crop. The parties dispute whether the adjuster told Mr. Meyer that the crop was a total loss, although the adjuster admits that the crop was damaged. On July 6, three Rain and Hail adjusters went to Mr. Meyer's farm and reexamined his crop. The parties dispute whether the adjusters told Mr. Meyer that the beans were not going to make it and would have to be torn up, although one of the adjusters admits to offering Mr. Meyer a payment under the policy to replant 50 to 60 acres.

On July 11, one of Rain and Hail's adjusters called to tell Mr. Meyer that the University of Nebraska Extension Service had found disease in the bean plants. Mr. Meyer claims to have had a conversation with Mr. Conlon the next day in which Mr. Meyer said he was going to plow under the crop and wanted payment under the policy at 999 pounds per acre. According to Mr. Meyer, Mr. Conlon refused, stating that he would only pay under a lower yield per acre. Mr. Conlon denies this conversation.

Mr. Meyer claims he regarded Mr. Conlon's alleged refusal to honor the

999 pound figure as meaning that he actually had no insurance coverage and decided his only recourse was to try to salvage the damaged crop. In September, Mr. Meyer harvested the beans at a rate of 1,126 pounds per acre. Mr. Meyer contends that in order to bring the crop in at this level, he had to secure expert advice, water the beans almost 24 hours a day, weed and cultivate 520 acres by hand, and replant 100 acres. Mr. Meyer's expert asserts that Mr. Meyer's efforts were extraordinary, and that the bean crop should have been declared a total loss and adjusted at 999 pounds per acre. According to Mr. Meyer, his extra efforts cost more than $68,000 in excess of what it would have cost to bring an undamaged crop to market.

When Rain and Hail found out that Mr. Meyer was bringing in a crop, it sought unsuccessfully to collect the premium under an assignment previously executed by Mr. Meyer. The assignment was in favor of a seed company that had sold Mr. Meyer seed on credit, and allowed Rain and Hail to collect its premium out of the proceeds of Mr. Meyer's crop sold to or by the seed company. On October 1, the insurance premium came due under the contract, and on November 14, Rain and Hail filed suit against Mr. Meyer in Iowa to collect the premium. Mr. Meyer's policy provided that the premium was to be paid in Iowa, and Rain and Hail's Iowa attorney filed an affidavit stating that suing out-of-state defendants in Iowa was the company norm.

On November 21, Rain and Hail sent Mr. Meyer a letter demanding he remit payment of the premium to its Montana office. Mr. Meyer did not pay the premium.

On January 25, 1995, an Iowa court entered default judgment against Mr. Meyer for the premium amount after service attempted by certified mail was returned as unclaimed. Later, the Iowa court set aside the judgment when it found that the post office had not delivered the mail to Mr. Meyer. In setting aside the judgment, the Iowa court noted that although Rain and Hail knew Mr. Meyer had retained counsel to handle the crop insurance dispute and, in fact, was involved in ongoing settlement discussions with Mr. Meyer's lawyer, it had not informed Mr. Meyer's attorney of the pending Iowa suit before requesting default judgment.

On August 2, Mr. Meyer filed this action against National Farmers Union, Rain and Hail, and Jerry Conlon for: (1) breach of contract; (2) negligent document preparation; (3) negligent misrepresentation; (4) bad faith/breach of duty of good faith and fair dealing in insurance contracts; (5) abuse of process; (6) intentional interference with a contractual relationship; and (7) outrageous conduct/intentional infliction of emotional distress. The district court granted summary judgment for the defendants on all of Mr. Meyer's claims, and he appealed. However, he did not pursue his intentional interference with a contractual relationship claim before our Court, and we consider that claim

abandoned.  We will address his other arguments in turn.

## II.  ANALYSIS

A.    Standard of Review

We review a summary judgment ruling de novo, applying the same legal standard as used by the district court pursuant to Fed. R. Civ. P. 56(c).  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).  "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Id. (quoting Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995)).  A "material fact is one which might affect the outcome of the dispute under the applicable law."  Ulissey v. Shvartsman, 61 F.3d 805, 808 (10th Cir. 1995).  "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant."  Kaul, 83 F.3d at 1212 (quoting Wolf, 50 F.3d at 796).  We examine the factual record and reasonable inferences drawn from it in the light most favorable to the non-movant.  See id.  "If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court."  Id. (quoting Wolf, 50 F.3d at 796).

B.      Preemption

In State of Kansas ex rel. Todd v. United States, 995 F.2d 1505 (10th Cir. 1993), our Court held that "the FCIC can promulgate regulations preempting state laws 'not consistent with the purpose, intent, or authority of the [FCIA].'" Id. at 1509 (quoting 7 C.F.R. § 400.351) (emphasis added).  Today, the defendants ask us to go one step further and hold that no state law causes of action are consistent with the FCIA and FCIC regulations, that federal law has preempted all state law causes of action pertaining to FCIC crop insurance contracts.[2]   Because we need not consider Mr. Meyer's state law causes of action if the FCIA and its implementing regulations have preempted them, we will resolve the preemption issue first.  Then, because we find federal law does not preempt state law causes of action consistent with the FCIA and FCIC regulations, we will turn to Mr. Meyer's claims.

---

[2]      Unfortunately, the parties have created some confusion by relying on complete preemption cases and using the phrase "complete preemption" as a synonym for ordinary preemption.  "Complete preemption" is a term of art for an exception to the well-pleaded complaint rule.      See Schmeling v. Nordam, 97 F.3d 1336, 1339 (10th Cir. 1996) (distinguishing between "complete preemption" and ordinary preemption); 14B Charles A. Wright et al., Federal Practice and Procedure § 3722.1 (1998).  Additionally, "complete preemption" analysis and ordinary preemption analysis are not fungible.      Compare Schmeling , 97 F.3d at 1342-43 (adopting "replacement preemption" analysis in "complete preemption" case) with Todd, 995 F.2d at 1509-11 (describing ordinary preemption analysis). As the parties are actually arguing over whether      the FCIA has wholly, rather than "completely," preempted state law causes of action against reinsurers, we confine our analysis to the more relevant ordinary preemption case law.

The United States Constitution's Article VI Supremacy Clause gives Congress the power to preempt state law. See Todd, 995 F.2d at 1510.

> Preemption occurs when Congress expresses a clear intent to preempt in a federal statute; when there is a conflict between federal and state law; when compliance with both federal and state law is impossible; when there is an implicit barrier in the federal statute to state regulation; when Congress has comprehensively occupied an entire field and leaves no room for state law; or when state law is an obstacle to the objectives and purpose of Congress.

Id. at 1509-10. Additionally, an agency's preemption regulations, promulgated pursuant to Congressional authority, have the same preemptive effect as statutes. Id. at 1509. After a thorough examination of both the FCIA and the FCIC's regulations, we hold that none of Todd's preemption scenarios apply to bar Mr. Meyer's claims against the defendants.

State law applies to FCIA contracts, with two exceptions: (1) when FCIC contracts provide that state law does not apply and (2) when state law is inconsistent with FCIC contracts. 7 U.S.C. § 1506(*l*). Neither exception applies in this case. The crop insurance contract between Mr. Meyer and Rain and Hail did not provide that state law did not apply to it. Therefore, by the plain language of § 1506(*l*), state law covers the contract unless that law is inconsistent with it. The defendants do not show us, and we cannot see, how Mr. Meyer's state law cause of action on the crop insurance contract is inconsistent with it. Thus, Mr. Meyer's suit is allowed under § 1506(*l*).

Additionally, the FCIA contemplates that private insurance companies will be sued and will have to pay when they are at fault:

> The Board [of Directors of the FCIC] shall provide [reinsured] agents and brokers with indemnification, including costs and reasonable attorney fees, from the [FCIC] for errors or omissions on the part of the [FCIC] or its contractors <u>for which the agent or broker is sued or held liable, except to the extent the agent or broker has caused the error or omission</u>.

7 U.S.C. § 1507(c) (emphasis added). Of course, if the FCIA created alternative causes of action, then state law might not be the method by which the agent is "sued or held liable." However, the FCIA "[is] barren of language regarding suits against private companies reinsured by the FCIC." <u>Williams Farms of Homestead, Inc. v. Rain and Hail Ins. Servs., Inc.</u>, 121 F.3d 630, 634 (11th Cir. 1997). Therefore, were we to accept the defendants' argument, we would make § 1507(c) meaningless because indemnification would never be necessary: No plaintiff could sue because the FCIA preempts state law causes of action but does not create federal causes of action to replace them. This is not the intent of Congress, as the statute's plain language shows.

Nor has the FCIC shown an intent to preempt all state law causes of action. Like the statute, the FCIC's regulations concerning state and local preemption specifically contemplate suit for breach of contract, while at the same time denying states the right to interfere in FCIC contracts:

> State or local governmental entities or non-governmental entities are

-10-

specifically prohibited from . . . [l]evy[ing] fines [or] judgments . . . against companies . . . arising out of actions or inactions on the part of . . . individuals and entities authorized or required under the [FCIA], the regulations, any contract or agreement authorized by the [FCIA] or by regulations, or procedures issued by the [FCIC] (nothing herein is intended to preclude any action on the part of any authorized State regulatory body or any State court or any other authorized entity concerning any actions or inactions on the part of the agent, company or employee of any company whose action or inaction is not authorized or required under the [FCIA], the regulations, any contract or agreement authorized by the [FCIA] or by regulations or procedures issued by the [FCIC]) . . . ."

7 C.F.R. § 400.352(b) & (b)(4) (emphasis added). The parenthetical language permits lawsuits based on agents' actions not authorized by the FCIA or the FCIC, negating the defendants argument that the regulations interpret the FCIA as wholly preemptive. Nor is Mr. Meyer's suit preempted by the FCIC's regulations, as he asserts that the defendants failed to honor the terms of an FCIC contract—an action not authorized by the FCIA, the regulations, or the contract.

In Todd, we held that the FCIC reasonably adopted regulations prohibiting Kansas from interfering by regulation and statute with FCIC contracts. See Todd, 995 F.2d at 1509. We noted that the FCIC had adopted comprehensive regulations preempting inconsistent state law because: (a) state agencies were requiring changes in the terms of the crop insurance contracts; (b) states were forcing the FCIC to pay state taxes on premiums for reinsured contracts, even though the FCIC is specifically exempt from such taxes under the FCIA; and (c) states were garnishing, placing liens on, and attaching crop indemnities, despite

the fact that the FCIA exempted crop indemnities from such state action.  See id. at 1508.  In response to this state interference, the FCIC adopted regulations purporting to preempt state law, and we held that the regulations did, in fact, preempt state law.  See id. at 1512.  However, in holding that regulations that interfere with the purpose of the FCIA and its crop reinsurance contracts are preempted, we certainly did not bar state law causes of action that allow farmers to enforce FCIC contracts against reinsurers.  In fact, because contract suits advance the purpose of the FCIA by ensuring that farmers are paid and because, as we have already concluded, the FCIA and FCIC regulations contemplate such suits, Todd actually reinforces the proposition that federal law has not preempted such state law causes of action.

Congress has not expressed a clear intent to preempt all state law causes of action against private reinsurers.  And, while we have already held that state law that conflicts with the FCIA and FCIC regulations—or their objectives and purpose—is preempted, there is no conflict between federal law and Mr. Meyer's state common law causes of action to enforce the contract with Rain and Hail. Nor is compliance with both federal and state contract law impossible, at least as FCIC contracts are currently written.  Additionally, there is no implicit barrier in the FCIA to state causes of action to enforce contracts.  Finally, Congress has not comprehensively occupied the entire field of crop insurance and left no room for

-12-

state law.

The FCIA does not wholly preempt state law; rather, it preempts state law inconsistent with the purpose of the Act. And the FCIC's regulations simply clarify that federal law only preempts state suits contrary to the FCIA's purpose. Therefore, Mr. Meyer's state law causes of action, which are not contrary to the purpose of the FCIA, are not preempted by the FCIA or the FCIC's regulations.

C.    Breach of Contract

1.    Mr. Meyer's Failure to Pay His Premium

We agree with the district court that Mr. Meyer's failure to pay his premium is not fatal to his breach of contract claim. The district court held that Mr. Meyer had a right to setoff the amount of any premium against any damage payment that might be made because his alleged loss. Meyer, 957 F. Supp. at 1499-1500. According to the district court, the right to setoff occurred before the premium was due, and therefore, non-payment of the premium did not bar the action. Id. at 1500.

The crop insurance policy states, "You cannot bring suit or action against us unless you have complied with all of the policy provisions." Aplt's App. vol. II, at 433. See also 7 C.F.R. § 401.7 ("No indemnity shall be paid unless the insured complies with all terms and conditions of the contract."). Listed under

-13-

"General Provisions" at "a." is the "Agreement to Insure," id. at 423, that reads, "We will provide the insurance described in this policy in return for the premium." Id. at 426.

Listed under "Special Provisions–Dry Beans" at "7." is the "Annual Premium" provision that states that "[t]he annual premium is earned and payable at the time of planting" and that "[a]ny unpaid premium due us may be deducted from any indemnity payable to you." Id. at 431. See also 7 C.F.R. § 401.8, General Crop Insurance Policy Terms and Conditions, 5 a. ("The annual premium is earned and payable at the time insurance attaches."). The acreage reports provide that the premium due date was October 1, 1994. Aplt's App. vol. I, at 224, 288.

We agree with Rain and Hail that the insurer's right to deduct any unpaid premium from any indemnity should not be confused with the clear responsibility of the insured to pay the premium. The policy plainly provides that the premium is earned and payable at planting, even though it may be billed and due later. See Aplt's App. vol. II, at 440 (application); 7 C.F.R. § 401.8, General Crop Insurance Policy Terms and Conditions, 21 e.("'Billing date'--The first date upon which an insured is billed for insurance coverage and which generally falls at or near harvest time. Interest accruing on any unpaid premium balance attaches 30 days after the billing date."). Absent citation to authority, Rain and Hail argues

that payment of the premium is a condition precedent to suit. We are not persuaded given that coverage exists prior to payment of the premium, and the insurer may deduct any unpaid premium from any indemnity. These facts, together with the general nature of the language relied upon, simply do not provide clear indication of a condition precedent. See generally 20 John Alan Appleman, Insurance Law and Practice, § 11416 (1980) ("Nor is a tender of a premium then due generally a condition precedent to recovery.").

### 2.     Rain and Hail's Duty to Adjust the Loss

In challenging the district court's decision that no loss occurred because production exceeded the highest possible alternative on the guaranteed yield per acre, Mr. Meyer argues that Rain and Hail breached the contract by refusing to adjust the loss prior to harvest. See Aplt's Br. at 22. He contends that adjusters from Rain and Hail told him first on June 29 and later on July 6 that his crop was a total loss, yet did not adjust the loss. According to Mr. Meyer, this breach prior to harvest entitles him to consequential damages including the $68,000 in extra costs he incurred by taking his crop to harvest. See Aplt's Br. at 23.

The Wyoming amendatory endorsement reads:

4.     DUTIES AFTER LOSS . . . .

b.     *Our Duties Are*:
        . . . .

-15-

(2)     Pay or reject the loss within 30 days after we receive the proof
        of loss and any supporting information.

Aplt's App. vol. II, at 433.  Despite this provision, nothing in the policy requires the insurance company to adjust the loss upon learning of a probable loss, as opposed to receiving a written proof of loss.  See id. at 426, 427 (§ 4(a)(1) & (6)).

Moreover, the policy expressly contemplates that it may be necessary to defer adjustment until after harvest:

C.     *Deferred Adjustment.*

        At times it may be necessary for us to defer the
        adjustment of a covered loss until the actual loss can be
        determined.  We will not pay for reduction of yield
        resulting from your failure to care for the crop during
        the deferral period.

Id. at 427 (§ 4(d)).  This provision is consistent with the balance of the policy that requires the insured to care for the crop after a probable loss, and to give written notice if it does not expect to do so or if it wants consent to put the acreage to another use.  See id. at 426 (§ 4(a)(1)(b)) (cited in Aplt's Br. at 22).  Consent to put the acreage to another use will not be given until it is too late or impractical to reseed or replant the insured crop.  See id.

The policy contemplates two methods of measuring a loss–actual harvest and an appraisal.  See id. at 430 (§ 4(c)).  Where the insured abandons the crop or puts the acreage to another use without the consent of the insurer, the insurer

will count the applicable guarantee as appraised production, reducing any loss. See id. at 430 (§ 4(c)(3)(b)). Where the insured obtains consent to put the acreage to another use, the appraised potential production will be counted as production, subject to reappraisal under certain conditions. See id. at 430 (§ 4(c)(4)). These provisions make it clear that the insurer is not required to determine the loss prior to harvest. While the insurer might determine a loss prior to harvest in some circumstances, the summary judgment evidence in this case simply does not suggest the lack of a reasonable basis for relying upon the policy provisions and declining to adjust the loss prior to harvest. See State Farm Mutual Auto. Ins. Co. v. Shrader, 882 P.2d 813, 825 (Wyo. 1994).

2.     Rejection of Coverage

Mr. Meyer argues that Rain and Hail rejected or repudiated coverage when it declined to adjust the loss before harvest at a 999 pound per acre guaranteed yield. See Aplt's Br. at 23; Aplt's Reply Br. at 15. An insurer that stands on its rights under the contract does not commit anticipatory repudiation. See New York Life Ins. Co. v. Viglas, 297 U.S. 672, 676-77 (1936); Bill's Coal Co. v. Board of Public Utilities, 682 F.2d 883, 886 (10th Cir. 1982); Kimel v. Missouri State Life Ins. Co., 71 F.2d 921, 923 (10th Cir. 1934). This is particularly true in this case where Mr. Meyer and Rain and Hail were arguing not about coverage,

but the amount of coverage based upon yield amounts. Moreover, the facts in this case simply do not constitute the type of "positive, unequivocal or distinct renunciation of the agreement" that Wyoming requires for anticipatory repudiation. See J.B. Serv. Court v. Wharton, 632 P.2d 943, 946 (Wyo. 1981).

### 3. Actual Crop in Excess of Claimed Guaranteed Yield

The district court ruled that Mr. Meyer's claim for breach of contract must fail because he "brought in the bean crop at a rate substantially higher than the [alleged] per acre coverage." Meyer, 957 F. Supp. at 1500. We agree that Mr. Meyer's successful 1,126 pounds per acre harvest prevents his breach of contract action. The policy defines loss as "[a] condition that occurs when the insured crop yield falls below the production guarantee." Aplt's App. vol. II, at 424. This language prevents Mr. Meyer from having a loss under the contract, and we cannot conclude on this record that Rain and Hail breached the contract by failing to adjust the loss prior to harvest at 999 pounds per acre.

### 4. Failure to Agree to Terms

The district court stated that "both parties knew at the time the acreage report was submitted that they did not agree on the coverage per acre" and, therefore, that there was no binding contract. Meyer, 957 F. Supp. at 1500.

Disputed issues of fact, including the quantity contained in the Assignment, would preclude summary judgment on this ground. See Frost Constr. Co. v. Lobo, Inc., 951 P.2d 390, 394 (Wyo. 1998) ("Whether a contract has been formed is a question of fact."). However, we affirm the district court's grant of summary judgment on the contract claim based upon the absence of anticipatory repudiation or breach of the contract.

D.    Negligent Preparation of Documents

The district court found no evidence that Wyoming has recognized or would recognize a cause of action for negligent preparation of documents. Therefore, it granted summary judgment to the defendants on this claim. On appeal, Mr. Meyer states, "The lower court based its decision exclusively on legal argument. [Mr. Meyer] presented facts which, if believed, would establish a duty and a breach of that duty. The duty arose not from the case law but from the facts and the standards in the crop insurance industry." Aplt's Br. at 25 (citation omitted).

As we are a court of law, we find legal arguments particularly persuasive. Thus, because Mr. Meyer does not take issue with the district court's "exclusively legal argument" that Wyoming does not recognize the cause of action he advances, we decline to review the district court's decision and affirm its grant of

summary judgment on this claim.

E.      Negligent Misrepresentation

The district court correctly granted summary judgment against Mr. Meyer on his claim for negligent misrepresentation.  The elements of such a claim in Wyoming are:  (1) false information; (2) supplied in the course of one's business; (3) for the guidance of others in their business; (4) failure to exercise reasonable care in obtaining or relating the information; and (5) pecuniary loss resulting from justifiable reliance on that information.  See Verschoor v. Mountain West Farm Bureau Mutual Ins. Co., 907 P.2d 1293, 1299 (Wyo. 1995).

Although Mr. Meyer's expert stated that, according to industry custom, the Assignment created a binding crop insurance contract at the 999 pound per acre figure, we doubt that Mr. Meyer's expert could testify to a legal conclusion that the Assignment created a binding contract.  See Okland Oil Co. v. Conoco Inc., 144 F.3d 1308, 1328 (10th Cir. 1998); Specht v. Jensen, 853 F.2d 805, 809-10 (10th Cir. 1988) (en banc).  Assuming that amount in the Assignment might be evidence of a disputed contractual term, Mr. Meyer's position is that the 999 pound per acre figure is not false, as required by the first element of this cause of action.

Moreover, the Assignment was prepared not for the guidance of Mr. Meyer

in his business, but rather for the benefit of Prosser and Rain and Hail. The Assignment secured Prosser's credit to Mr. Meyer in the event that loss proceeds became payable under the policy and allowed Rain and Hail to collect its premium out of crop proceeds received by Prosser. Aplt's App. vol. I, at 226. Thus, at best, Rain and Hail intended to supply the 999 pound per acre figure to Prosser for guidance in its business, and Mr. Meyer fails to satisfy the third element of the cause of action. See Verschoor, 907 P.2d at 1300 ("[O]ne who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose.") (quoting Restatement (Second) Torts § 552 cmt. a (1977)).

Finally, Mr. Meyer cannot claim a payable loss under the policy with the 999 pound per acre figure given his actual production, nor can he claim a loss based upon payment of the crop insurance premium, having failed to pay it. Mr. Meyer thus fails to satisfy the fifth element of the cause of action.

F. Insurance Bad Faith/Breach of Duty of Good Faith and Fair Dealing

The district court determined that Rain and Hail did not breach the duty of

-21-

good faith and fair dealing because it was "fairly debatable" whether Mr. Meyer's crop was a total loss and whether the policy contained a 999 or 805 pound per acre production guarantee. Meyer, 957 F. Supp. at 1502. The district court also held that Rain and Hail's Iowa collection efforts were routine. Id. at 1503. Our analysis is similar.

The seminal Wyoming case for breach of duty of good faith in insurance contracts is McCullough v. Golden Rule Ins. Co., 789 P.2d 855 (Wyo. 1990), in which the Wyoming Supreme Court held that "the appropriate test to determine bad faith is the objective standard whether the validity of the denied claim was not fairly debatable." Id. at 860. In a first-party bad faith claim, the insured must demonstrate an absence of a reasonable basis for denying a claim and the insurer's knowledge or reckless disregard of the lack of a reasonable basis. See id. The denial of Mr. Meyer's claim was supported by several "fairly debatable" grounds, that is, a reasonable insurer would have denied or delayed payment on such grounds, see id., but we need mention only two. First, as we have held, no circumstances here required Rain and Hail to adjust the loss prior to harvest. Second, despite the factual dispute about whether the production guarantee was 999 or 805 pounds per acre, no covered loss occurred when the harvest exceeded the production guarantee.

In Hatch v. State Farm Fire & Cas. Co., 842 P.2d 1089 (Wyo. 1992), the

-22-

Wyoming Supreme Court expanded the tort of first-party bad faith to encompass the investigation, handling and denial of a claim, even if the claim was denied on a "fairly debatable" ground, where the insurer goes "beyond a reasonable denial of the claim and engage[s] in unreasonable or unfair behavior to gain an unfair advantage." Id. at 1099. See also Shrader, 882 P.2d at 828. The tort "flow[s] from engaging in oppressive and intimidating claim practices." Hatch, 842 P.2d at 1099. In his opposition to summary judgment, Mr. Meyer relied upon (1) the insurer's refusal to adjust the loss after the damage and at the level of production contained in the Assignment, and (2) the insurer's Iowa collection efforts. Aplt's App. vol I, at 189-90. Specifically, he contends that the insurer indicated that the crop was a total loss, denied coverage at the 999 pound per acre level and possibly altogether, and forced him into heroic efforts to save the crop. Once the crop was harvested, the insurer demanded the premium prematurely, attempted to levy on the crop, and sued him in Iowa.

On appeal, Mr. Meyer bolsters his argument with the opinion of his expert that Rain and Hail's conduct in adjusting the claim was substandard, and not in conformity with FCIC standards and regulations. See Aplt's App. vol. I, at 284-85. Despite the expert's view that the claim was handled in an intentional and oppressive manner, the underlying facts simply do not suggest the type of intentional, oppressive behavior going beyond a reasonable denial of the claim.

-23-

First, to the extent that Rain and Hail's challenged conduct involved asserting its position on contract issues including the terms and interpretation of the policy, such conduct simply did not involve the factual issues attendant to the investigation, handling and denial of a claim that <u>Hatch</u> bad faith encompasses. See <u>Davis v. State</u>, 910 P.2d 555, 559 (Wyo. 1996). Second, Rain and Hail is not responsible for injuries and damage for which the policy provides no coverage–there must be a causal link between the injuries and damage complained of and the conduct of Rain and Hail. See <u>Hatch v. State Farm Fire & Cas. Co.</u>, 930 P.2d 382, 394 (Wyo. 1997). Stated another way, a <u>Hatch</u> bad faith claim cannot substitute for coverage. Third, although Rain and Hail's handling of this matter was hardly ideal, and contributed to the acrimony between the parties, deviation from "best practices" or "industry standards" does not equate with the type of reckless or intentional oppressive conduct required for this tort. Fourth, for reasons similar to those we discuss below, Rain and Hail's availing itself of the Iowa forum for premium payment without notice to Mr. Meyer's counsel does not constitute oppressive conduct on this record. Finally, in light of the above, we have reviewed the deposition passages of various fact witnesses relied upon by Mr. Meyer in his briefs and are not persuaded that he has presented evidence from which a jury could return a verdict for him on a <u>Hatch</u> bad faith claim.

-24-

G.    Abuse of Process

To show abuse of process in Wyoming, a plaintiff must demonstrate "(1) an ulterior purpose, and (2) the wilful act in the use of the process which is not proper in the regular conduct of the legal proceeding." Bosler v. Shuck, 714 P.2d 1231, 1234 (Wyo. 1986). "'[T]here is no action for abuse of process when the process is used for the purpose for which it is intended, [even though] there is an incidental motive of spite or an ulterior purpose of benefit to the defendant.'" Toltec Watershed Improvement Dist. v. Johnston, 717 P.2d 808, 811 (Wyo. 1986) (quoting Restatement (Second) of Torts § 682 (1977)). Bosler cited approvingly several cases whose facts exemplify the type of wilful act necessary to satisfy the second element of the tort. See 714 P.2d at 1234-35. Among the cases Bosler cited is Barquis v. Merchants Collection Ass'n of Oakland, Inc., 496 P.2d 817 (Cal. 1972) (en banc), in which the court reversed dismissal of a suit alleging that the defendant "knowingly and wilfully instituted actions against consumers in the wrong county, under inadequate complaints, for the ulterior purposes of impairing these individuals' defenses of the actions and with the intent of securing default judgments by virtue of the inconvenience of the improper forum." Id. at 823. According to the California Supreme Court, such filings, if proven, would constitute abuse of process because "fil[ing] actions in an improper county pursuant to statutorily inadequate pleadings" amounts to "a wilful act in the use

-25-

of process not proper in the regular course of the proceeding" and because "the intent to impair individuals' rights to defend suits and . . . [cause] default judgments by making it inconvenient for defendants to defend suits on their merits" is an ulterior purpose.  Id. at 824 (internal quotation marks omitted).

Mr. Meyer alleges that Rain and Hail's litigation in Iowa was abusive under Barquis.  He states that Iowa courts could not have personal jurisdiction over him and that, without notifying his attorney, Rain and Hail filed suit in Iowa with the intent of securing a default judgment against him.  Rain and Hail responds that it "routinely files collection actions in Iowa against out-of-state insureds," so Mr. Meyer was not treated differently than others.  Aple's Br. at 41.  Additionally, Rain and Hail asserts that its intent was clearly to notify Mr. Meyer, rather than obtain default judgment against him, because it attempted, albeit unsuccessfully, to serve him by mail.

After examining Mr. Meyer's proof that Rain and Hail abused process, we are not convinced that he has presented evidence, beyond mere conclusory allegations, from which a jury could return a verdict for him on this issue.  Mr. Meyer's case for abuse of process is planted in his assertion, which we agree with, that he could have successfully asserted lack of personal jurisdiction in Iowa courts.  See Omnilingua, Inc. v. Great Golf Resorts of World, Inc., 500 N.W.2d 721 (Iowa Ct. App. 1993) (holding that business that was to pay Iowa

corporation for contract work did not have sufficient minimum contacts as it was a "passive purchaser" of Iowa products and did not expect to be called into Iowa court). He feeds this claim with undisputed evidence that Rain and Hail refused to notify Mr. Meyer's counsel of the suit and proceeded to default judgment, despite the fact that Mr. Meyer's counsel "was actively engaged in discussions with [Rain and Hail]'s Montana counsel" at the time. Aplt's App. vol. I, at 38 (Undated Order in Rain and Hail Ins. Serv., Inc. v. Meyer, No. CL 64436 (Iowa Dist. Ct.)). Rain and Hail furthers Mr. Meyer's cause by admitting that this is the normal way it conducts its litigation, which actually suggests a pattern of practice that, under Barquis, would be further evidence of abuse of process. However, these hints and allegations of abuse of process are rebutted by Rain and Hail's sworn statement that it files all suits in Iowa for legitimate purposes, had no ulterior motive in suing Mr. Meyer in Iowa, and attempted to serve Mr. Meyer with process by mail. Thus, although we feel that Rain and Hail's decision to seek default judgment without informing Mr. Meyer's attorney was an unfortunate legal strategy, without concrete evidence to counter Rain and Hail's innocent explanation of Mr. Meyer's conclusory allegations, Mr. Meyer cannot sustain his abuse of process claim, and we affirm. See Cosner v. Ridinger, 882 P.2d 1243, 1249 (Wyo. 1994) (holding that a plaintiff's abuse of process claim alleging that various proceedings were filed without notice to him for the sake of concealing

his daughter or denying his visitation rights was "conclusional" and correctly dismissed).

H.    Outrageous Conduct/Intentional Infliction of Emotional Distress

The district court properly determined that, even under the facts as alleged by Mr. Meyer, Rain and Hail's conduct was not sufficiently outrageous to permit him to proceed on this claim. Wyoming uses the Restatement (Second) of Torts § 46 (1977) to define the scope of the tort: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress . . . ." Cosner, 882 P.2d at 1248 (quoting Restatement (Second) of Torts § 46(1) (1977)). Outrageous conduct is conduct that "goes 'beyond all bounds of decency, and [is] to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. d.). Severe emotional distress is that which "'is so severe that no reasonable man could be expected to endure it.'" Id. (quoting Restatement (Second) of Torts § 46 cmt. j.). To use an apt colloquialism, a plaintiff attempting to prove this claim has a hard row to hoe.

Mr. Meyer has introduced no evidence of his emotional state, and Rain and Hail's actions simply do not rise to the level required by the Restatement. Mr. Meyer alleges that Rain and Hail intentionally breached a contract, causing him

-28-

pecuniary loss. The record also reveals that Mr. Conlon stated that Mr. Meyer's father owed the company money on a past due debt and that Rain and Hail sued to collect the premium it contends Mr. Meyer owes it. The emotional impact of these facts is not so severe that no reasonable man could be expected to endure it. We affirm the district court's grant of summary judgment in favor of defendants on this issue.

## III. CONCLUSION

We affirm the district court's rulings that (1) the FCIA and the FCIC's regulations do not preempt state law causes of action, (2) Mr. Meyer's failure to pay his premium did not bar his suit, (3) Rain and Hail did not breach the insurance contract in denying Mr. Meyer's claim, (4) there is no cause of action for negligent preparation of insurance documents in Wyoming, (5) Mr. Meyer cannot show negligent misrepresentation of the terms of the Assignment, (6) Rain and Hail did not breach its duties of good faith and fair dealing on this record, (7) Mr. Meyer has not produced evidence that Rain and Hail abused process, and (8) Rain and Hail did not intentionally inflict emotional distress on Mr. Meyer.

AFFIRMED.