**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 27, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

THERESE DULLMAIER, as the
Wrongful Death Representative of
Karl-Heinz Phillip Dullmaier,

        Plaintiff - Appellant,

v.

XANTERRA PARKS & RESORTS;
JOHN DOES, I-IV,

        Defendants - Appellees.

Nos. 16-8017 & 16-8049

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:14-CV-00181-SWS)**

Gerard R. Bosch and Mary Alison Floyd, Law Offices of Jerry Bosch, LLC,
Wilson, Wyoming, for Plaintiff-Appellant.

Aaron P. Bradford, Bradford, Ltd, Denver, Colorado, David R. Fine, and Maxwell
N. Shaffer, Holland & Knight, LLP, Denver, Colorado, for Defendants-Appellees.

Before **BRISCOE**, **HARTZ**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

A Wyoming statute provides that "[a]ny person who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity." WYO. STAT. ANN. § 1-1-123(a). It also states that "providers" of such opportunities have no duty "to eliminate, alter or control the inherent risks within" certain sport or recreational opportunities. *Id.* § 1-1-123(b).

In 2012, Karl-Heinz Dullmaier was killed during a guided horseback ride in a wilderness area of Yellowstone National Park. His wife, Therese Dullmaier, brought a wrongful-death action against the company that provided the ride. The district court granted summary judgment to the company, and Ms. Dullmaier appeals.

The main question before us is whether Mr. Dullmaier's fatal injuries stemmed from risks that are inherent in the particular sport or recreational activity in which he elected to participate—that is, a guided horseback trail ride in a wilderness area. We conclude that his injuries did stem from such risks. We also determine that Ms. Dullmaier's other state-law claims—for negligent misrepresentation and nondisclosure—have no merit. Lastly, we reject Ms. Dullmaier's challenge to the district court's award of costs. We affirm.

**I**

Xanterra Parks & Resorts, Inc. ("Xanterra") is a Delaware corporation that provides guided horseback rides in Yellowstone National Park. Karl-Heinz Dullmaier was a German citizen who visited Yellowstone in 2012. This case

2

arose after Mr. Dullmaier was killed during one of Xanterra's tours.

## A

The Dullmaiers—along with Karen Donohoo, the family's au pair—traveled to Wyoming for a family vacation in July 2012. On the morning of July 30, Mr. Dullmaier and Ms. Donohoo arrived at Roosevelt Corrals for a one-hour horseback ride through Yellowstone National Park. They were given an acknowledgment-of-risk form, which stated that "[h]orses can act unpredictably," and that "[c]ertain risks are normally involved in riding," such as "collisions or falls." Aplt.'s App., Vol. 2, at 307. At the bottom of the form, a section stated that any rider who signed would "assume full responsibility for [him or her]self, . . . for bodily injury [or] death." *Id.* Mr. Dullmaier and Ms. Donohoo both signed the form.

Each one-hour ride followed the same path, beginning and ending at the Roosevelt Corrals and tracing a long loop through a wooded wilderness area. Riders started out on a dirt road and crossed into a meadow. From there, they rode over a small hill and eventually passed through an area known as Pleasant Valley. A creek, spanned by a narrow bridge, runs through Pleasant Valley. Riders must cross the bridge in a single-file line.

Three wranglers were assigned to guide the guests who had signed up for the one-hour ride. Jeremy Wilson, the lead wrangler, was to ride at the front of the group. Erin Flynn and Sarah Soltys, the outrider wranglers, were assigned to

3

stay alongside the other riders. Outrider wranglers "kind of just watch over half the line," and "mov[e] up [and] down" the line to make sure that the ride goes smoothly. *Id.* at 413. Ms. Soltys was assigned to the front half of the group, while Ms. Flynn took responsibility for the back half.

The ride began normally. There were twenty riders, including a few children. Mr. Dullmaier, riding a horse named Duke, was at the end of the line of riders. Ms. Donohoo was immediately in front of Mr. Dullmaier and Duke.

The riders eventually entered Pleasant Valley. Mr. Wilson was at the front of the line, looking back over the other riders. As they got close to the bridge, Mr. Wilson's horse, Bugs, stopped short. Mr. Wilson saw nothing that was blocking the path, so he kicked Bugs to keep moving. Bugs took a few steps forward. Suddenly, a few ducks flew out from underneath the bridge. The ducks surprised Bugs, who reared back, pivoted, and threw Mr. Wilson to the ground. Bugs then turned and took off in the opposite direction, running away from the bridge and back down the line of horses.

The commotion spooked Lakota, another horse in the line. He backed away from the bridge, then turned and began to run after Bugs. Still on the ground, Mr. Wilson saw that a child was still riding Lakota. He immediately started chasing the horse, "screaming [for the child to] '[p]ull back on the reins'" and slow Lakota down. *Id.* at 409. Lakota sped up. The child slid to the side and fell from the saddle, landing awkwardly on his head and shoulder. Worried that the boy

4

was seriously hurt, Mr. Wilson ran towards him and radioed back to the corrals for medical aid.

The line of horses started to break apart. From her position at the back of the line, Ms. Flynn could see that the other horses had "fanned out," probably to "get out of the way" when "Bugs and Lakota [had come] barreling through them." *Id.* at 397. Ms. Flynn later testified that the other horses probably did not see the ducks, "but they saw the other horses were scared, which made them nervous, too." *Id.* at 398. As she put it, "[h]orses do not like to be apart,"—when horses see another horse "take[] off running," the other horses usually "want to follow." *Id.* Within a few seconds, "[e]very single horse [had] turned" and started galloping away from the bridge toward the trail. *Id.* at 391.

Ms. Flynn and Ms. Soltys tried to regain control of the line. Their aim, Ms. Flynn said, was to "get control of [each] horse, unless somebody ha[d] come off of that horse." *Id.* Ms. Flynn later testified that they were less worried about losing riderless horses—those horses eventually make their way back to the corral on their own—than about the safety of each person riding the spooked horses. As she put it, runaway horses "are terrified." *Id.* at 399. "They just do not stop." *Id.*

One of those horses was Mr. Dullmaier's horse, Duke. *Id.* As the line broke apart, Duke ran back down the trail towards the hill. Ms. Flynn guessed that Duke was about 100 yards ahead of her, galloping at full speed toward the small hill on the other side of the valley. This alarmed Ms. Flynn. She knew that

5

"it's very hard to sit" in a saddle when riding downhill at a fast pace, and that "even the most experienced rider has problems coming downhill at a gallop." *Id.* at 391, 398.

Ms. Flynn felt that she needed to "do everything [she] could to help [Mr. Dullmaier] stop" before Duke reached the hill, since "Duke wasn't going to stop" unless she forced him. *Id.* So, she tried "to get around [Duke], come out in front of him, [and] form a T." *Id.* This would force Duke to slow down, giving Ms. Flynn a chance to grab his reins and redirect him until he stopped running. To reach Duke at the best angle—and to avoid scaring him, which might make him speed up—she rode after him in a wide curve, rather than chasing him from behind.

Riding hard, she eventually caught up with Duke and Mr. Dullmaier. She called out to Mr. Dullmaier, telling him to "[p]ull as hard as [he could] back on [his] reins." *Id.* at 391. She also yelled to Duke, who knows his name and responds to voice commands, trying to calm him. *Id.*

Neither tactic worked. Ms. Flynn was about twenty yards away from Duke when he crested the hill and began galloping down the other side. Mr. Dullmaier "started bouncing." *Id.* at 391. He eventually lost his grip on the saddle horn, slid to the side of the saddle, and fell to the ground. Ms. Flynn stopped her horse and immediately radioed for medical help. When she made it over to Mr. Dullmaier, he was unresponsive and bleeding from his ears, nose, and mouth. Mr.

6

Dullmaier was eventually airlifted to a hospital in Billings, Montana, where he died from his injuries.

**B**

Therese Dullmaier filed a complaint in Wyoming state court on July 29, 2014. She brought four state-law tort claims against Xanterra: (1) negligent misrepresentation; (2) nondisclosure; (3) negligent supervision and training; and (4) negligence. Xanterra removed the suit to the U.S. District Court for the District of Wyoming.

Thereafter, Xanterra moved for summary judgment. In support of its motion, Xanterra first argued that Wyoming law does not recognize a freestanding claim for negligent nondisclosure. As to the remaining three claims, Xanterra argued that any risks associated with spooked, runaway horses were inherent in the activity of horseback riding. And, pursuant to the Wyoming Recreation Safety Act ("WRSA"), WYO. STAT. § 1-1-121, it owed no duty to protect Mr. Dullmaier from the inherent risks of horseback riding. The district court agreed, granting Xanterra's summary-judgment motion on all of Ms. Dullmaier's claims.

Xanterra submitted a bill of costs on February 12, 2016. Ms. Dullmaier objected to the request. The clerk of court awarded Xanterra its costs and Ms. Dullmaier moved to review that award. In a six-page order, the district found that the costs were properly awarded.

Ms. Dullmaier now appeals the district court's summary-judgment order and its cost award.

## II

We review a district court's summary-judgment order de novo. *See, e.g.*, *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

Thus, not every factual dispute "will properly preclude the entry of summary judgment"; the dispute must be genuine and relate to material issues of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "As to materiality, the substantive law will identify which facts are material." *Id.* When applying this standard, we "view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).

This is a diversity case, so we apply the substantive law of the forum state, Wyoming. *See, e.g.*, *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 513 (10th Cir. 1994) ("[W]e must apply the most recent statement of state law by the state's highest court."); *see also Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1077 (10th Cir. 2007) ("The decision of an intermediate appellate state court 'is a

8

datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940))). "[W]hen a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, *and* on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue." *Kokins v. Teleflex, Inc.*, 621 F.3d 1290, 1295 (10th Cir. 2010) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)).

## A

We first address Ms. Dullmaier's claim for negligent misrepresentation. In that claim, she alleged that Xanterra "solicited and promoted their horseback rides," and "should have known that members of the general public would rely on the information provided" in choosing to go on one of the rides. Aplt.'s App., Vol. 1, at 24. She also alleged that she and Mr. Dullmaier "relied on [Xanterra's] information that the horses were trail broke" and that guides "were nearby [and] prepared to help." *Id.* Mr. Dullmaier's death, she averred, was "a direct result of these misrepresentations." *Id.*

Wyoming has adopted the negligent-misrepresentation standard laid out in the RESTATEMENT (SECOND) OF TORTS § 552. That standard requires a plaintiff to show (1) "[f]alse information supplied in the course of one's business for the

9

guidance of others in their business," (2) "failure to exercise reasonable care in obtaining or relating the information," and (3) "pecuniary loss resulting from justifiable reliance thereon." *Verschoor v. Mountain W. Farm Bureau Mut. Ins. Co.*, 907 P.2d 1293, 1299 (Wyo. 1995) (quoting RESTATEMENT (SECOND) OF TORTS § 552 (1965)).

The district court found that Ms. Dullmaier failed to satisfy these elements. In particular, it held that Ms. Dullmaier had never "allege[d] that Mr. Dullmaier relied upon the representations in his business or in a commercial transaction as required in the first element." Aplt.'s App., Vol. 5, at 1171.

This is the correct result. The Dullmaiers visited Yellowstone as part of a family vacation, not a business trip. Nothing in the record suggests that Mr. Dullmaier sought to do business with Xanterra. Nor does anything imply that the horseback-riding information that Xanterra provided to Mr. Dullmaier was somehow related to his commercial interests. Under the standard set out in § 552, Ms. Dullmaier has no claim for negligent misrepresentation. *See, e.g.*, *Meyer v. Conlon*, 162 F.3d 1264, 1272 (10th Cir. 1998) (concluding that no negligent-misrepresentation claim could be established when the defendants' representations were not made for "the guidance of [the plaintiff] in his business").

10

Ms. Dullmaier argues that we should apply § 311 from the RESTATEMENT (SECOND) OF TORTS, which sets out the tort for negligent misrepresentation involving physical harm. *See* RESTATEMENT (SECOND) OF TORTS § 311 (1965). Ms. Dullmaier argues that § 311 is more appropriate, since it "finds particular application where it is part of the actor's business or profession to give information upon which the safety of the recipient or a third person depends." *Id.* cmt. b.

But this argument has no merit. Wyoming courts have never recognized a generic negligent-misrepresentation tort like the one set out in § 311. *See Willis v. Bender*, 596 F.3d 1244, 1259 n.9 (10th Cir. 2010) (noting that Wyoming "has not adopted th[e] definition for the generic tort of negligent misrepresentation" set out in § 311 of the RESTATEMENT (SECOND) OF TORTS); *Corsi v. Jensen Farm*, No. 2:12-CV-052-SWS, 2013 WL 11330880, at *3 n.5 (D. Wyo. Oct. 11, 2013) (unpublished) ("Wyoming has not adopted [§ 311's] definition for the generic tort of negligent misrepresentation.").

**B**

Ms. Dullmaier also appeals from the district court's summary-judgment decision on her nondisclosure claim. In that claim, she alleged that Xanterra "failed to exercise reasonable care in insuring [sic] that [Mr. Dullmaier] was aware of the risks, hazards, and dangers associated with horseback riding."

11

Aplt.'s App., Vol. 1, at 25.

But this claim, which sounds in negligence, is not cognizable under Wyoming law. Wyoming does not recognize a tort for negligent nondisclosure. *See, e.g.*, *Claman v. Popp*, 279 P.3d 1003, 1015 n.1 (Wyo. 2012) ("Wyoming does not recognize a claim for negligent nondisclosure . . . ."). Therefore, Ms. Dullmaier's nondisclosure claim was properly dismissed.

## C

### 1

We now turn to Ms. Dullmaier's remaining claim for negligence.[1] The relevant law centers around the WRSA, Wyo. Stat. Ann. § 1-1-122, which applies to negligence claims involving sport or recreational opportunities, such as horseback riding. "In order to prevail on any negligence action, a plaintiff must first establish that the defendant owed him or her a duty of care." *Cooperman v. David*, 214 F.3d 1162, 1165 (10th Cir. 2000). "To protect providers of

---

[1] In her complaint, Ms. Dullmaier pleaded a separate claim for negligent supervision and training. In ruling on summary judgment, the district court determined that Wyoming treats such "claims as a form of negligence claim," and accordingly "consider[ed] [Ms. Dullmaier's] negligence and negligent training and supervision claims together." Aplt.'s App., Vol. 5, at 1172. On appeal, Ms. Dullmaier does not contend that the district court erred in this respect, nor does she pursue a separate and discrete challenge with respect to her negligent supervision and training claims. Therefore, we address here only Ms. Dullmaier's challenge with respect to her negligence claim and deem any separate argument with respect to her negligent supervision and training claim to be waived. *See, e.g.*, *Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007).

12

recreational sports and activities from liability for alpine skiing, equine activities, and other outdoor pursuits in the state, the Wyoming legislature limited their duty of care by enacting the [WRSA]." *Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1148 (10th Cir. 2004); *see Carden v. Kelly*, 175 F. Supp. 2d 1318, 1328 (D. Wyo. 2001) ("The [WRSA] limits the duty that a provider of a recreational activity owes to a participant."). Two provisions of that statute are important for our purposes.

The first provision is section 1-1-123 ("Assumption of the Risk"), which states that a person "who takes part in any sport or recreational opportunity assumes the inherent risks in that sport or recreational opportunity," and that "[a] provider of any sport or recreational opportunity is not required to eliminate, alter or control the inherent risks within the particular sport or recreational opportunity." WYO. STAT. ANN. § 1-1-123(a)–(b).

The second provision is section 1-1-122, which defines "inherent risk" as "those dangers or conditions which are characteristic of, intrinsic to, or an integral part of any sport or recreational opportunity." *Id.* § 1-1-122(a)(i). That provision also defines "provider" in pertinent part to mean "any person . . . [who] offers or conducts a sport or recreational opportunity." *Id.* § 1-1-122(a)(ii). The term "sport or recreational opportunity" encompasses "horseback riding and any

13

other equine activity," including "[d]ay use rental riding, [or] riding associated with a dude ranch." *Id*. § 1-1-122(a)(iii), (a)(iv)(G).

The Wyoming legislature amended the WRSA in 1996 to clarify the meaning of "inherent risk." *See* 1996 Wyo. Sess. Laws ch. 78 (S.F. 65). But the legislature at that time "did not define the meaning of 'inherent risk' more precisely through careful iteration." *Sapone v. Grand Targhee*, 308 F.3d 1096, 1101 (10th Cir. 2002). Instead, it "settled on an approach that leaves to the courts the task of defining what is and what is not an inherent risk within the meaning of the statute." *Id.* And, in undertaking this definitional task, we must acknowledge that "[w]hat is inherent to a sport or activity . . . is far from self-evident." *Dunbar*, 392 F.3d at 1148.

With this background in mind, we ask whether Mr. Dullmaier's death was the result of an "inherent risk" of the guided trail ride through a wilderness area that Xanterra provided. If it was, then Xanterra owed Mr. Dullmaier no duty to "eliminate, alter or control" that risk. Wyo. Stat. Ann. § 1-1-123.

**2**

"The circumstances of each case control whether the question of inherent risk is to be decided by the court or by a jury." *Kovnat v. Xanterra Parks & Resorts*, 770 F.3d 949, 955 (10th Cir. 2014). "The level of factual specificity required to establish an inherent risk will often but not always preclude summary

14

judgment on the duty question." *Creel v. L & L, Inc.*, 287 P.3d 729, 737 (Wyo. 2012); *see Cooperman*, 214 F.3d at 1166 (noting that the Wyoming Supreme Court "did concede, however, that in certain instances where no material questions of fact exist, the district court may decide as a matter of law that a provider does not owe a duty to the participant under the Safety Act"); *see also Addakai v. Witt*, 31 P.3d 70, 75 (Wyo. 2001) ("In close cases, we have expressed a preference for allowing jurors to decide just what is or is not a risk inherent to a particular recreational activity[.]").

As for the requisite level of factual specificity, we opined in *Cooperman*: "When attempting to determine whether a risk is inherent to a sport, we can not look at the risk in a vacuum, apart from the factual setting to which the rider was exposed. And, we must evaluate the risk at the greatest level of specificity permitted by the factual record." 214 F.3d at 1167; *accord Madsen v. Wyo. River Trips, Inc.*, 31 F. Supp. 2d 1321, 1328 (D. Wyo. 1999) (construing the WRSA); *see also Creel*, 287 P.3d at 735 (stating that the WRSA's inherent-risk analysis requires courts to "consider[] the specific facts surrounding the claimed injury"). More specifically, we seek to identify with the greatest degree of specificity possible the risks that caused the consumer's alleged harm and, then, inquire whether those risks were inherent in the sport or recreational opportunity in which the consumer elected to participate.

15

A careful examination of three of our cases decided in the horseback-riding context illuminates this fact-specific inquiry and underscores helpful guideposts for our resolution of this case:

***Cooperman:*** We begin with *Cooperman*. That case involved a guided trail ride in Pinedale, Wyoming. The plaintiff "felt his saddle begin to slide" "around the belly of the horse." 214 F.3d at 1163. The plaintiff slid with the saddle, fell to the ground, and hurt his shoulder. *Id.* Before the saddle slipped, the plaintiff "had not had any problems with his horse or his saddle, and had not sensed that anything was wrong with the saddle." *Id.* The plaintiff sued the provider in district court, and the court granted summary judgment to the provider. *Id.* at 1163–64.

We affirmed. We pointed out that "[h]orseback riding undoubtedly carries some inherent risk that the rider will fall off the horse and get injured." *Id.* at 1167. For example, "[a] horse . . . stumbl[ing] on an uneven path, or rear[ing], or simply begin[ning] to gallop for no apparent reason . . . clearly would qualify as inherent risks of horseback riding." *Id.* But "[s]imply because some risks are inherent in horseback riding . . . does not mean that all risks of falling from a horse are necessarily inherent." *Id.*

The evidence revealed that Mr. Cooperman fell because "the saddle slipped." *Id.* at 1168. And we had no doubt based on the record that "a slipping

16

saddle, with no other facts provided, is an inherent risk of horseback riding." *Id.* But the facts presented to us obliged us to inquire at "a greater degree of specificity than simply stating that the saddle slipped." *Id.* In this regard, we recognized that "[w]hile slipping saddles under certain fact specific situations may be inherent, under other facts it may not be inherent." *Id.* at 1167 n.5. Here, the evidence indicated that Mr. Cooperman's saddle was "loosely cinched" and that this was a risk to which Mr. Cooperman was exposed along with the risk of saddle slippage. *Id.* at 1168. Thus, we held that, "[f]or purposes of summary judgment, then, the issue is whether a slipping saddle that is loosely cinched is an inherent risk of horseback riding." *Id.*

We concluded that it was. Saddles must be cinched when placing them on horses, and "because cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle." *Id.* Consequently, we reasoned that "[t]his imprecision in the cinching of the saddle" is inherent in "the sport of horseback riding," which involves saddles. *Id.* More specifically, we stated, "When the cinching of a saddle can be too tight or too loose, and the cinching is not done with scientific precision, it is inherent in the sport that the provider at times will cinch too loosely or too tightly." *Id.*

17

Thus, there was a causal connection between Mr. Cooperman's harm and an inherent risk of the sport or recreational opportunity that he participated in—a guided horseback ride through a wilderness area. Put another way, there was a causal connection between his harm and the inherent risk of slipping in a saddle that was loosely cinched. This signaled the ultimate demise of Mr. Cooperman's negligence claim under the WRSA because the provider had no duty to ameliorate, mitigate, or eliminate (i.e., "to eliminate, alter or control") this risk.

Before sounding the death knell on Mr. Cooperman's claim, however, it is notable that we acknowledged that the fact-specific inquiry in some instances may result in us discerning—at a greater level of specificity—atypical or non-inherent causal factors that may preclude summary judgment. In this regard, we recognized the need to inquire whether Mr. Cooperman was able to come forward with "some evidence on summary judgment that would raise a question of fact that the loosely cinched saddle was caused, not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding." *Id.* at 1169. We declined to opine "as to what factual proof would take the risk of a slipping saddle outside the realm of an inherent risk," finding it sufficient to conclude that Mr. Cooperman was not able to furnish any such proof. *Id.*

18

***Kovnat:*** Litigating over a very similar incident that occurred over a decade after *Cooperman*, the plaintiff in *Kovnat* sought to provide such proof of atypical risks to which the provider had exposed her—extending beyond the risks inherent in horseback-riding—that pertained to the cinching of a saddle and uneven stirrups. 770 F.3d at 958. In the words of *Cooperman*, the plaintiff endeavored to provide proof that "would take the risk of a slipping saddle outside the realm of an inherent risk." *Cooperman*, 214 F.3d at 1169. Applying *Cooperman*'s teachings, we affirmed the district court's summary-judgment order in favor of the provider with respect to the cinching of the saddle but reversed with respect to the uneven stirrups. *See id.* at 958–60.

The negligence lawsuit in *Kovnat* stemmed from injuries that the plaintiff sustained while participating in an evening horseback trail ride. *See id.* at 951–52. Her saddle slipped and moved until its seat was underneath the horse, and the plaintiff moved with the saddle; as a consequence, "she struck her back on the ground" and suffered fractures to several vertebrae. *Id.* at 952. The district court framed the relevant issue for summary-judgment disposition as whether a saddle slipping due to uneven stirrups and/or an incorrectly-secured cinch constituted an inherent risk of horseback riding, and answered the question in the affirmative. *See id.* at 958. The district court concluded therefore that the provider had no duty under the WRSA to mitigate, ameliorate, or eliminate these

19

risks and was entitled to judgment against the plaintiff's negligence claims. *See id.* We affirmed the district court's judgment regarding the cinch but reversed as to the uneven stirrups, holding that "genuine issues of material fact exist regarding the issue." *Id.*

Unsurprisingly, in the aftermath of *Cooperman*, the plaintiff did not argue that a loose cinch in itself was an atypical risk of the kind of horseback-riding opportunity in which she participated; instead, the plaintiff alleged that the provider's negligent conduct in failing "to check the cinch prior to her leaving the corral . . . exposed [her] to the risk of riding with an *unusually loose* saddle cinch." *Id.* at 959 (emphasis added). We rejected this contention, concluding that "the evidence in the record on appeal . . . indicates that [the provider's] employees repeatedly checked the cinch tension on her saddle multiple times before she left the corral." *Id.* Having determined that the plaintiff's purported proof of an atypical risk associated with cinching was without substance, we concluded that plaintiff was in essentially the same place as the *Cooperman* plaintiff. Specifically, "we agree[d] with the district court that any risks associated with the cinching of [the plaintiff's] saddle were inherent in the sport of horseback riding," and thus affirmed the court's judgment under the WRSA. *Id.*

We reached the opposite conclusion, however, with respect to the uneven stirrups, concluding under the evidence that the plaintiff "would have been exposed to an atypical risk, rather than a risk inherent in the sport of horseback riding." *Id.* at 960. In doing so, we acknowledged that "the district court was correct in noting that the evidence in the record establishes that, like saddle cinching, the task of ensuring that a rider's stirrups are even is a matter of human judgment that is not performed 'with scientific precision.'" *Id.* (quoting *Cooperman*, 214 F.3d at 1168)). But we concluded that a reasonable jury could find that this was not a situation (like *Cooperman*) where the plaintiff's injuries stemmed from unwanted but inevitable imprecision by human beings in adjusting the length of stirrups—a risk that was inherent to horseback riding. *See id.* (noting "that is not what happened in this case").

Instead, the record indicated that "after [the plaintiff] was assisted by [the provider's] personnel in mounting her horse, her stirrups were noticeably uneven" and "she immediately said to her husband, loud enough for [the provider's] wranglers to hear" that her legs hung unevenly and she was uncomfortable. *Id.* Further, the evidence showed that "uneven stirrups are visually noticeable and necessarily warrant corrective action." *Id.* Thus, we reasoned that

> a jury could reasonably find that the wrangler who overheard and commented on [the plaintiff's] concerns about her stirrups [i.e., saying that they were "fine"] was not in a position to see both of [the plaintiff's] stirrups and otherwise made no attempt to ensure

21

that the stirrups were even, or was aware of the unevenness of [the plaintiff's] stirrups but made a choice not to adjust them.

*Id.* "We conclude[d] that, under either of these factual scenarios, [the plaintiff] would have been exposed to an atypical risk, rather than a risk inherent in the sport of horseback riding. In turn, [the provider] would not be immune from liability under the WRSA." *Id.*

**_Sapone:_** Though the legal steps of our analysis were somewhat less explicit, we followed a similar path in *Sapone*, in concluding that the plaintiffs had raised triable issues of fact regarding the existence of a causal connection between atypical or non-inherent risks and the harm at issue. That case involved a young girl (apparently six years old) who was injured after falling from a horse during a private horseback-riding lesson for the girl and her young brother. 308 F.3d at 1098. Despite the lesson being for young children, the instructor had placed the children on adult-size horses, given them no instructions on the handling of the horses, and taken the children on an advanced trail instead of confining the lesson to a fenced-in corral. *Id.* We succinctly described the incident contributing to the girl's injuries:

> During their descent down the mountain trail, [the girl's] horse suddenly "bolted" for the stables, and [the girl] fell from her saddle. With her foot stuck in the stirrup, she landed on her head and was dragged along the ground for at least several paces before she could wrench her foot free and roll to her back. In the process, her head was struck by the horse's hoof.

22

*Id.*  The girl's parents sued the company that provided the lesson.  The district court granted the provider's summary-judgment motion, finding that "falling from a 'bolting' horse is an inherent risk of horseback riding."  *Id.* at 1100.

We reversed, holding that "genuine questions of material fact remain which are relevant to the question of whether the plaintiff's injury was caused by an inherent risk."  *Id.* at 1098.  We did not question the obvious fact that the girl "fell from the horse."  *Id.* at 1103.  And we recognized that "it is an inherent risk that a horse might bolt"; however, citing *Cooperman*, we underscored that this was "not the specific question before us."  *Id.* at 1104.  "[W]e disagree[d] with the district court's conclusion that falling from this *particular* bolting horse is an inherent risk of horseback riding."  *Id.* (emphasis added).  In adopting this position, we progressed to a greater level of factual specificity, as *Cooperman* had instructed, in discerning the risks at issue.  In particular, we seemed to take note that the particular sport or recreational opportunity, in which the parents elected to have their child participate, was not an adult horseback-riding trail tour, but rather a private children's horseback-riding lesson.  Specifically, we reasoned that there were genuine issues of material fact regarding whether the child's fall from a horse in this children's-lesson context, stemmed in significant part from atypical or non-inherent risks to which the provider exposed the child.  *See id.* ("[The child] presented evidence to show that the injury may have been caused not by an

inherent risk, but rather 'by a risk that was atypical, uncharacteristic, [and] not intrinsic to the recreational activity of horseback riding.'" (quoting *Cooperman*, 214 F.3d at 1169)); *see also Dunbar*, 392 F.3d at 1149–50 ( "[I]n *Sapone*, we concluded that a child sustaining injuries when falling from the saddle during a trail-riding lesson was not an inherent risk when there was evidence that the horse was too large, that the instructions were inadequate, that no headgear was provided, and that the route was too dangerous.").

We reasoned that in a children's ride, a provider has certain duties toward the participants. Such duties include "provid[ing] the children horseback riding instructions," "providing adequate headgear," and "giving the lesson in [a] practice corral instead of on an advanced trail ride." *Id.* at 1104. We held that the provider's failure to carry out these duties engendered genuine issues of material fact regarding whether it "violat[ed] a duty *separate and distinct* from those [duties] embedded in the inherent risks of horseback riding." *Id.* (emphasis added). In other words, there were genuine issues of material fact regarding whether the provider's conduct exposed the child to risks beyond the inherent risks associated with a bolting horse. We put it this way: "[W]hen we frame the question with the requisite specificity, we also conclude that a reasonable jury might conclude that [the child's] injuries were the result of negligence that is not characteristic of, intrinsic to, or an integral part horseback riding." *Id.* at 1105.

24

Accordingly, we reversed the district court, holding that "material questions of disputed facts remain to be decided by a jury." *Id.*

\*\*\*

These three horseback-riding cases underscore three key guideposts that are embedded in the WRSA caselaw of our circuit and the Wyoming Supreme Court that are helpful to our resolution of this appeal:

*First*: We inquire into the nature of the risk at "the greatest level of specificity permitted by the factual record." *Cooperman*, 214 F.3d at 1167. That is, we seek to determine the specific risks that the consumer was exposed to in participating in the provider's sport or recreational opportunity.

*Second*: We seek to discern whether the specific risks—associated with the consumer's injury—fall within the ambit of risks that are inherent in the sport or recreational opportunity. In doing so, we remain cognizant that

> Some risks may occur from the choices a recreation provider makes on behalf of the participant and from the conditions in which the recreational opportunity is provided. Thus, atypical or uncharacteristic risks can arise even in those specific sports the Wyoming legislature clearly intended to exempt from liability for inherent risks.

*Dunbar*, 392 F.3d at 1149; *accord Roberts v. Jackson Hole Mountain Resort Corp.*, No. 16-CV-24-R, 2017 WL 5247912, at \*4 (D. Wyo. Jan. 19, 2017) (unpublished). Thus, as we saw in *Kovnat* and *Sapone*, a provider may deliver the

25

opportunity in a manner that "increase[s] the inherent risks of the sport," *Creel*, 287 P.3d at 739, thereby exposing the consumer to atypical, non-inherent risks. *See Kovnat*, 770 F.3d at 960; *Sapone*, 308 F.3d at 1104.

*Third*: In the endeavor to discern the universe of inherent risks of a sport or recreational opportunity—as well as those risks that fall "outside of the realm of an inherent risk," *Cooperman*, 214 F.3d at 1169, i.e., atypical risks—a critical step may be defining with precision the opportunity at issue. As *Sapone* illustrates, the unique nature of the opportunity—there, a private horseback-riding lesson involving only young children—may impact our assessment of what risks are properly deemed atypical. *See* 308 F.3d at 1104; *see Dunbar*, 392 F.3d at 1149, 1151–52 (concluding that "genuine issues of material fact exist[]" concerning the inherent-risk question and noting that "what sport or activity characterizes [the plaintiff's] behavior is a matter of considerable dispute"). We may find guidance in discerning the precise nature of the sport or recreational opportunity at issue by focusing, not only on the choices of the provider, but also the choices of the consumer. *See Dunbar*, 392 F.3d at 1149 ("To determine what risk is inherent to [the plaintiff's] activity, we must go beyond a broad characterization and inquire into the specific circumstances of both her actions and those of the recreation provider.").[2]

---

[2]     *Dunbar* involved an alpine skier—the plaintiff—who was injured

(continued...)

26

---

[2](...continued)
when she fell twelve feet into a snowboard half-pipe. 392 F.3d at 1146. At the time of the fall, she was trying to leave a specially designated terrain park "designed for advanced skiers and snowboarders who choose to recreate in a very challenging risk-filled environment." *Id.* The plaintiff was a "self-described intermediate skier," and *"*[t]here [was] no suggestion . . . that [she] intended to jump any of the terrain jumps or intended to try her hand at stunts as a skier in a snowboard half-pipe." *Id.* at 1146–47. The plaintiff sued the Wyoming ski resort for negligence. *Id.* The district court granted summary judgment for the resort pursuant to the WRSA, finding that her fall was an inherent risk of alpine skiing in the terrain part. *Id.* We reversed.

In doing so, we observed a key error in the district court's analytical focus:

> Although the district court emphasized the choices and conduct of the plaintiff in determining what risks she assumed, the court makes no distinction between the risks that are inherent to her *actual choices*—to ski into the terrain park area, but *not* to "take" any of the features—and risks that are inherent to choices one would make when actually intending to ski over the specific features.

*Id.* at 1151 (emphases added). We concluded that "it was error for the district court to conclude that . . . having assessed the risks and decided *not* to use the terrain features, that there is no material issue of fact concerning whether a skier could leave without accruing those very risks." *Id.* (emphasis added); *see also* 1151 ("[W]e conclude that the district court erred when it found that the risk of falling twelve feet into a snowboard half-pipe was an inherent risk of [the plaintiff's] alpine skiing when she had stopped and observed double diamond terrain features and had chosen not to 'take' those features."). Thus, in *Dunbar*, we highlighted that the inquiry into the particular opportunity at issue—and, derivatively, the risk inherent in it—must focus, not only on the opportunities that the provider offered, but also the particular opportunity in which the consumer agreed to participate. *See id.* at 1149 ("To determine what risk is inherent to [the plaintiff's] activity, we must go beyond a broad characterization and inquire into the specific circumstances of *both* her actions and those of the recreation provider." (emphasis added)).

Though not exclusively defining the parameters of our analysis, we find the foregoing three guideposts illuminating. Cognizant of them, we have carefully considered the relevant caselaw and the factual record. We conclude that Mr. Dullmaier's death was the result of specific risks that are inherent in the sport or recreational opportunity in which he elected to participate—that is, a guided horseback-riding tour of a wilderness area.

**a**

It is undisputed that Xanterra offered members of the public a guided horseback-riding tour of a wilderness area, and Mr. Dullmaier elected to participate in this tour. We thus proceed to examine the factual record with the greatest degree of specificity possible to discern the nature of the risks that Xanterra exposed Mr. Dullmaier to in delivering this opportunity and whether those risks were inherent in that opportunity.

Mr. Dullmaier fell during a guided trail ride through a wilderness area of Yellowstone National Park. Notably, unlike *Sapone*, Xanterra did not offer this horseback-riding opportunity exclusively to young children; indeed, typically, the majority of the participants of such rides were adults. *See* Aplt.'s App., Vol. 2, at 389 (Ms. Flynn testifying that a "full ride" consisted of twenty riders, and that they usually had only "four to six kids"); *id.*, Vol. 1, at 75 (requiring in Xanterra's acknowledgment-of-risk form that children younger than twelve be

28

accompanied by an adult and specifying that no child younger than eight could participate at all).  Therefore, the unique universe of inherent and atypical risks that would likely be associated with a children-only sport or recreational opportunity ordinarily would not be present here.

The entire ride took place in a wilderness area where riders ordinarily would anticipate encountering native wildlife.  *See* Aplt.'s App., Vol. 2, at 449–50 (Dep. of Edward W. Dabney, dated Jan. 5, 2016) (agreeing that on "this particular trail ride, the one-hour trail ride from Roosevelt," riders "may encounter a number of different wildlife on this trail," including bears, bison, and birds).  This specific ride includes a wetland that offered "a natural habitat for . . . ducks and other waterfowl."  *Id.* at 449, 450; *see also id.* at 306 (noting that the one-hour ride "traverses a variety of terrain and natural features including wetlands" that are home to "birds, ducks, and wetland fowl").  It logically follows that, by signing up for this particular trail ride, a rider would assume the inherent risk that a wild animal—like a duck—might suddenly appear on the trail.

And if a wild animal appears, there is the inherent risk that a horse will spook.  We pointed out in *Cooperman* that horses can act unpredictably when confused or frightened.  *See* 214 F.3d at 1167 (noting that a horse might "simply begin to gallop for no apparent reason" and concluding that this "clearly would qualify as inherent risks of horseback riding").  Even Ms. Dullmaier's experts

29

acknowledged this risk, testifying that a trail horse "may spook as a result of encountering wildlife" and conceding that Xanterra had "advise[d] . . . guests that it was a possibility that . . . they might encounter wildlife and that the horse may react to that encounter." Aplt.'s App., Vol. 2, at 443.

The wranglers on this ride knew this, too. Mr. Wilson testified that "horses are prey animals so they are spooky and worried about what is around them," *id.*, at 401, while David Saddler testified that there might be "random things you just can't prepare for" on a ride, including when "something jump[s] out and spook[s] the horses." *Id.* at 429 (Dep. of David Saddler, dated Jan. 15, 2016). In fact, they had seen it happen that very summer. *Id.*, Vol. 4, at 1068 (Aff. of Sarah Soltys, dated Jan. 29, 2016) (noting that, in the summer of 2012, at least one other rider had been "thrown off [his horse] when a badger jumped out" onto the trail path).

When one horse spooks, there is a risk that the others will also spook. Xanterra's expert Wayne G. Hipsley opined that, "if one horse on the trail ride goes on alert for a potential threat, other horses will respond in an equal manner." *Id.*, Vol. 2, at 306 (Expert Opinion of Wayne G. Hipsley, dated Dec. 14, 2015). Mr. Hipsley also noted that "[i]f the horse is not controlled by the rider the horse's reaction may be escalated." *Id.* Ms. Dullmaier's experts essentially acknowledged as much. For example, one of them, Mr. Dabney, wrote that "[i]f the horses in front spook and react . . . by jumping, raring or bucking," it causes

30

"a chain reaction . . . down the line of horses in which the other horses become nervous, agitated and begin reacting negatively." *Id.*, Vol. 1, at 154 (Expert Opinion of Ed Dabney, dated Nov. 11, 2015).

This "chain reaction" often leads a group of horses to break into a gallop and run to safety. As Mr. Dabney put it, horses display "the flight response of herd type prey animals" and may "continue running toward safety" when alarmed. *Id.* at 159. And another of Ms. Dullmaier's experts, Kenneth Laughery, Jr., noted that "[a] horse responding to being spooked by a gait change (e.g., 'running') is also a known and foreseeable event encountered often by wranglers," as is "[a] horse's flight response." *Id.* at 122 (Expert Opinion of Kenneth Ronald Laughery, Jr., dated Nov. 15, 2015).

Further, it is an unremarkable consequence of these inherent risks that a rider might fall from a spooked, runaway horse. As Ms. Flynn explained, stopping a runaway horse is "very difficult," since "[a] runaway horse does not stop" when it is "terrified . . . [or] afraid of something." *Id.*, Vol. 2, at 395, 399. The possibility of such falls is greater on a trail ride over varied terrain—like the ride that Mr. Dullmaier participated in—because, in that environment, a frightened horse might run down a steep slope, making it harder for a rider to stay in his or her saddle. Ms. Flynn testified that, when a horse begins running

31

downhill "at a fast[] gait, it's very hard to sit, especially if you don't know what you're doing." *Id.* at 391.

From this, we conclude that this particular opportunity (i.e., guided trail ride through a wilderness area)—under the specific factual circumstances of this case—carried at least four relevant inherent risks. Namely, there were inherent risks that (1) wildlife, including ducks, would be present on the trail ride; (2) a wild animal might appear suddenly, spooking the lead horse into running away; (3) the other horses might react similarly and run with the lead horse; and (4) the runaway horses may travel over downhill portions of the trail at a fast pace when seeking to escape perceived danger.

**b**

We ask then whether Mr. Dullmaier's injuries stemmed from such risks inherent to the particular opportunity. We answer in the affirmative. Thus, the district court did not err in ruling that Xanterra was insulated from possible negligence liability under the WRSA.

As we point out above, the trail ride that Mr. Dullmaier elected to participate in had inherent risks that quite naturally could have resulted in a participant falling from a runaway horse spooked by wildlife. And, unfortunately, those risks are precisely what led to Mr. Dullmaier's fall and fatal injuries. The ride followed a trail that wound through the Yellowstone wilderness. When the

32

riders approached the narrow bridge in Pleasant Valley—a wetlands area and known habitat for waterfowl—a few ducks flew out from underneath the bridge. The lead horse spooked, turned, and ran through the line of horses. This frightened Mr. Dullmaier's horse, who took off after the lead horse and began running towards a hill at a full gallop. As the horse began galloping down the other side of the hill, Mr. Dullmaier lost his grip on the saddle and fell. The risks resulting in Mr. Dullmaier's fall were clearly inherent in the particular sport or recreational opportunity that he undertook. And nothing suggests that Mr. Dullmaier's fatal injuries stemmed from atypical risks to which Xanterra exposed him.

**c**

Ms. Dullmaier's arguments to the contrary are unavailing. She argues that Xanterra failed to eliminate the risks that led to Mr. Dullmaier's death; that failure itself, she argues, introduced "non-inherent hazards" that were "substantial factors" in Mr. Dullmaier's death. Aplt.'s Opening Br. at 45. Specifically, she argues that Xanterra should have (1) scared the ducks out from under the bridge before the riders approached it, (2) provided guides who had more skill and experience, (3) trained its guides to deal with emergency situations, (4) given instructions on how to stop a horse in an emergency, along with providing a

33

wrangler at the back of the line to help guests in an emergency, and (6) provided riders with different reins.

But Ms. Dullmaier does not point to anything that Xanterra did to "increase the inherent risks" of the guided wilderness horseback ride, *Creel*, 287 P.3d at 739; more specifically, she does not offer proof of atypical risks to which Xanterra exposed Mr. Dullmaier. Read fairly, the "substantial factors" Ms. Dullmaier identifies are merely steps that Xanterra might have taken to minimize the ride's *inherent* risks. And, under the WRSA, Xanterra simply did *not* have such an obligation: the statute expressly states that "provider[s]" are "not required to eliminate, alter, or control the inherent risks" within the sport or recreational opportunity. WYO. STAT. ANN. § 1-1-123(b); *see Kovnat*, 770 F.3d at 955 ("Xanterra 'is not required to eliminate, alter or control the inherent risks' associated with horseback riding." (citing WYO. STAT. ANN. § 1-1-123(b))). As we advised in *Cooperman*, "It is important to remember . . . in framing the duty question, we are not to ask whether the recreational provider could have controlled or eliminated the risk. . . . [W]e are simply to look at the specific facts which surround the risk without questioning the provider's ability to control or eliminate those risks." 214 F.3d at 1167 n.4. Consequently, it would be incorrect for us to conclude that Xanterra had a duty to take the steps Ms. Dullmaier identified.

34

Relatedly, Ms. Dullmaier argues that "[w]hether a risk can be eliminated is

a factor in determining if that risk is inherent in the sport." Aplt.'s Br. at 44; *see*

*also id.* at 34–36 (arguing that expert testimony showed that Xanterra's

employees "knew or should have known where the ducks were located" and

suggesting that the risks posed by the ducks were not inherent). This is incorrect.

As we made clear in *Cooperman*, *Sapone*, and *Kovnat*, *supra*, a provider's ability

to eliminate a given risk is irrelevant to determining whether that risk is inherent

in the opportunity. Instead, pursuant to the WRSA, our inquiry focuses on

whether the specific risk at issue was inherent in the particular sport or

recreational opportunity in which the consumer participated; only when the risk is

determined to have been atypical or non-inherent do we consider whether the

provider could have "eliminate[d], alter[ed], or control[led]" the risk." WYO.

STAT. ANN. § 1-1-123(b).[3]

---

[3] Ms. Dullmaier's arguments seem to be based on a misunderstanding
of our caselaw. We have previously determined that a reasonable jury could have
inferred that a provider exposed a participant in a sport or recreational
opportunity to atypical risks by *not* taking certain actions. *See Kovnat*, 770 F.3d
at 960; *Sapone*, 308 F.3d at 1104. The principle at work there, however, was that
in failing to act under the factually specific circumstances of those cases, the
provider may actually have "increase[d] the inherent risks of the sport," *Creel*,
287 P.3d at 739—*viz.*, we concluded that there were triable issues regarding
whether the providers' failures to act exposed participants to atypical risks. (Of
course, in other factually specific circumstances, a provider's affirmative acts
may have precisely the same effect.) These cases patently do not stand for the
proposition that providers may be held liable for their failures to mitigate,
ameliorate, or eliminate *inherent* risks of a sport or recreational

(continued...)

35

In sum, we conclude that Mr. Dullmaier's fatal injuries stemmed from risks that were inherent in the particular sport or recreational opportunity in which he elected to participate. Accordingly, under Wyoming law, Xanterra had no duty to protect against those risks. Therefore, Ms. Dullmaier's negligence claim must fail.

## III

Ms. Dullmaier argues that the district court erred in finding that costs were properly awarded to Xanterra. Rule 54(d)(1) provides that costs, other than attorneys' fees, should generally "be allowed to the prevailing party." FED. R. CIV. P. 54(d)(1). We have recognized that this rule "creates a presumption that the district court will award costs to the prevailing party." *Cantrell v. Int'l Bhd. of Elec. Workers, AFL-CIO, Local 2010*, 69 F.3d 456, 458–59 (10th Cir. 1995) (en banc). We have also held that the "district court possesses 'broad discretion' in awarding costs." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1144, 1148 (10th Cir. 2009) (quoting *U.S. Indus. v. Touche Ross & Co.*, 854 F.2d 1223, 1247 (10th Cir. 1988), *overruled on other grounds as recognized by Anixter v.*

---

³(...continued)
opportunity—even if they can easily do so—because the WRSA imposes no such duty on them. *See, e.g.*, *Cooperman*, 214 F.3d at 1167 n.4 ("[W]e are simply to look at the specific facts which surround the risk without questioning the provider's ability to control or eliminate those risks. And because at this stage of the analysis we are focusing only on duty, we do not ask if the defendant was negligent in any of its actions with regard to the plaintiff.").

36

*Home-Stake Prod. Co.*, 77 F.3d 1215, 1231 (10th Cir. 1996)).  Accordingly, we review costs awards only for an abuse of discretion.  *See Touche Ross*, 854 F.2d at 1245.  A district court abuses its discretion only where it (1) commits legal error, (2) relies on clearly erroneous factual findings, or (3) where no rational basis exists in the evidence to support its ruling.  *See, e.g.*, *Elephant Butte Irrigation Dist. v. U.S. Dep't of the Interior*, 538 F.3d 1299, 1301 (10th Cir. 2008).

On appeal, Ms. Dullmaier offers two arguments to support her contention that the district court's costs award evinces an abuse of discretion: (1) the court erred in not enforcing § 1924's affidavit requirement as to Xanterra; and (2) the court erred in awarding costs for depositions when they "were not necessary for purposes of the case."  Aplt.'s Opening Br. at 57.  Both arguments fail.

First, the district court did not abuse its discretion in finding that Xanterra's costs request complied with the applicable costs statute, 28 U.S.C. § 1924, as well as the District of Wyoming's Local Rules.  Section 1924 states that

> [b]efore any bill of costs is taxed, the party claiming any item of cost or distribution shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and the services for which fees have been charged were actually and necessarily performed.

37

28 U.S.C. § 1924.

Particularizing this statutory mandate, the District of Wyoming's Local Rules require a party seeking costs to "prepare and file a bill of costs . . . on [Administrative Office of the U.S. Courts] form 133," ("AO form 133") which should "include an itemized schedule of costs incurred, documentation for all costs claimed, and a statement that such schedule is correct and that the charges were actually and necessarily incurred." D. WYO. CIV. R. 54.2(a). AO form 133 requires a litigant to *affirm, under penalty of perjury*, that the reported costs "were actually and necessarily performed." Aplt.'s App., Vol. 5, at 1185.

Xanterra's designated agent signed AO form 133 on February 26, 2016. The district court found that "the declaration in the AO 133 form satisfies 28 U.S.C. § 1924's [affidavit] requirement," since the agent "attest[ed] to the necessity of the charges." *Id.* at 1229.

The district court did not abuse its discretion in coming to that conclusion. The language of AO 133 does not materially differ from that of § 1924. And, as the district court noted, other courts have reached the same result, finding that a "[d]eclaration submitted by [the prevailing party] as part of the Bill of Costs satisfied § 1924." *Ankerson v. Am. Zurich Ins. Co.*, No. 1:15cv108-LG-RHW, 2016 WL 927225, at * 1 (S.D. Miss. Mar. 11, 2016) (unpublished); *Fitbug*

38

*Limited v. Fitbit, Inc.*, No. 13-1418 SC, 2015 WL 2251257, at *2 (N.D. Cal. May 13, 2015) (unpublished).

As for Ms. Dullmaier's second argument regarding the depositions, under the Local Rules, litigants may seek costs for depositions, "or portions thereof," that are "used in support of . . . any dispositive motion." D. WYO. CIV. R. 54.2(a)(2)(C). Xanterra sought costs for only those depositions associated with its summary-judgment briefing. Contrary to Ms. Dullmaier's arguments, the district court clearly relied in its summary-judgment ruling on Xanterra's deposition transcripts—specifically, in recounting the factual background in three pages of its order, and then later by drawing from those deposition sources in its legal analysis. And, as the district court put it, "[s]imply because the Court may have ultimately found certain arguments presented to be irrelevant does not mean it did not consider them in its decision." Aplt.'s App., Vol. 5, at 1230. In light of all of this, we conclude that the district court was within its discretion in finding that the deposition costs were properly awarded.

## IV

For the foregoing reasons, we affirm the district court's judgment.