FILED

08/26/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 24-0537

DA 24-0537

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 188

GERARD GIRASOLE,

      Plaintiff and Appellant,

  v.

PAWS UP RANCH, LLC, d/b/a
THE RESORT AT PAWS UP,

      Defendant and Appellee.

APPEAL FROM:   District Court of the Fourth Judicial District,
                In and For the County of Missoula, Cause No. DV-22-1300
                Honorable Leslie Halligan, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Joseph Cook, Philip McGrady, Heenan & Cook, PLLC, Billings, Montana

      For Appellee:

            W. Bridger Christian, Christian, Samson & Baskett, PLLC, Missoula, Montana

Submitted on Briefs:  April 16, 2025

Decided:  August 26, 2025

Filed:

                           _____
                                     Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Gerard Girasole appeals the Fourth Judicial District Court's grant of summary judgment to Paws Up Ranch, LLC, on Gerard's negligence claims after he was injured when his horse stumbled during a guided ride at Paws Up. We agree with the District Court that under the record facts of the case, Gerard's injuries resulted from inherent risks of horseback riding as defined by the Equine Activities Act. Because Gerard fails to raise genuine issues of material fact, we affirm the District Court's summary judgment order.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Gerard Girasole and his wife Elise traveled from Connecticut to Montana in August 2022 for a vacation at Paws Up, a luxury guest resort east of Missoula. The Girasoles had scheduled a private guided horseback ride for the day after their arrival. Before their horseback ride, the Girasoles signed a "Guest Assumption of Risk and Indemnification Agreement." The Agreement contained a bolded section titled "INHERENT RISKS," which warned that Paws Up activities could result in "BODILY INJURY; SERIOUS BODILY INJURY[;] ILLNESS; PARALYSIS; TRAUMA; AND EVEN DEATH." It provided that

> known risks include trauma to the body including, but not limited to, sprains, twists, cuts, bruises, breaks, burns, paralysis, and other trauma of any and all body parts; . . . the propensity of an equine to behave in ways that may result in injury or harm to or the death of persons on or around the equine; the unpredictability of an equine's reaction to such things as medication; sounds; sudden movement; and unfamiliar objects, persons, or other animals[.]

The Agreement stated that it could not eliminate all inherent risks and that its enumeration of "inherent risks is not complete and . . . there are other risks, hazards and dangers,

2

which . . . may be inherent in a given activity." The Agreement "cover[ed] any 'equine activity' as defined in the Montana Code Annotated." The Girasoles signed the Agreement, acknowledging that "they . . . [were] responsible for participating in these activities" and that the presence of Paws Up's agents and representatives was "no assurance of safety or the lessening of any of these risks."

¶3 Anna Oglesby, a Paws Up employee, guided the Girasoles' horseback ride. Oglesby asked about the Girasoles' prior riding experience and helped them mount their horses, and the group began riding. Between fifteen and thirty minutes into the ride, Gerard's horse, Reba, stumbled and fell onto her front knees. Gerard's body fell forward as Reba stood up, causing his pelvis to collide with the saddle. The impact fractured part of Gerard's pelvis and caused an injury to his right sacroiliac joint. Gerard was life-flighted from Missoula to Seattle, where he underwent surgery for his injuries.

¶4 Gerard filed a complaint against Paws Up in November 2022, alleging four claims: negligence, premises liability, negligence per se, and negligent infliction of emotional distress. Paws Up filed a motion for summary judgment on all of Gerard's claims. The District Court agreed with Paws Up that the claims failed under the Montana Equine Activities Act and dismissed his case.

**STANDARD OF REVIEW**

¶5 We review a summary judgment ruling de novo, applying the criteria of M. R. Civ. P. 56. *Stricker v. Blaine Cnty.*, 2023 MT 209, ¶ 15, 414 Mont. 30, 538 P.3d 394. We therefore "review the ruling to determine if genuine issues of material fact existed and

3

whether the moving party was entitled to judgment as a matter of law." *Stricker*, ¶ 15 (citation omitted). "Once the moving party meets this burden, the nonmoving party must present material and substantial evidence to raise a genuine issue of material fact." *B.Y.O.B., Inc. v. State*, 2021 MT 191, ¶ 12, 405 Mont. 88, 493 P.3d 318. "We draw all reasonable inferences from the evidence offered in favor of the party opposing summary judgment; but conclusory statements, speculative assertions, and mere denials are insufficient to defeat a motion for summary judgment." *B.Y.O.B., Inc.*, ¶ 12 (citation and internal quotations omitted).

## DISCUSSION

¶6 Montana is one of over twenty-five states with statutes defining the responsibilities and duties of participants in and providers of equine activities. Sections 27-1-725 to -728, MCA; *see generally* Tracy Bateman Farrell, Annotation, *Validity, Construction, and Application of Statutory Exemptions from Liability for Persons Injured by Equine or Equestrian Activities*, 79 A.L.R.6th 487, § 2 (Westlaw through Aug. 20, 2025) (summarizing cases from twenty-eight state jurisdictions with similar equine activities statutes). Montana's Equine Activities Act sets forth "the policy of the state of Montana that a person is not liable for damages sustained by another solely as a result of risks inherent in equine activities if those risks are or should be reasonably obvious, expected, or necessary to persons engaged in equine activities." Section 27-1-725, MCA. It also articulates the State's policy "that an equine activity sponsor or equine professional who is

4

negligent and causes foreseeable injury to a participant bears responsibility for that injury in accordance with other applicable law." Section 27-1-725, MCA.[1]

¶7 Subject to enumerated exceptions, the Act provides that "an equine activity sponsor or an equine professional is not liable for an injury to or the death of a participant engaged in an equine activity resulting from risks inherent in equine activities." Section 27-1-727(1), MCA. "Risks inherent in equine activities" are

> dangers or conditions that are an integral part of equine activities, including but not limited to:
> (a) the propensity of an equine to behave in ways that may result in injury or harm to or the death of persons on or around the equine;
> (b) the unpredictability of an equine's reaction to such things as medication; sounds; sudden movement; and unfamiliar objects, persons, or other animals;
> (c) hazards, such as surface and subsurface ground conditions;
> (d) collisions with other equines or objects; or
> (e) the potential of another participant to not maintain control over the equine or to not act within the person's ability.

Section 27-1-726(7), MCA. In relevant part, the Act's liability limitation does not apply if the equine activity sponsor or the equine professional:

> (i) provided equipment or tack and the equipment or tack caused the injury because the equine activity sponsor or equine professional failed to reasonably and prudently inspect or maintain the equipment;
> (ii) provided the equine and failed to make reasonable and prudent efforts to determine the ability of the participant to safely engage in the equine activity and the participant's ability to safely manage the particular equine based on the participant's representations as to the participant's ability;

---

[1] The parties do not dispute that Paws Up meets the statutory definition of "equine activity sponsor," or that Gerard was a "participant" engaging in an "equine activity." *See* § 27-1-726(4) to (6), MCA.

5

> (iii) owned, leased, rented, or otherwise was in lawful possession and control of the land or facilities upon which the participant sustained injuries caused by a dangerous latent condition that was known or should have been known to the equine activity sponsor or the equine professional; [or]
>
> (iv) committed an act or omission that constituted willful or wanton disregard for the safety of the participant and the act or omission caused the injury . . . .

Section 27-1-727(3)(a), MCA.

¶8 Emphasizing the Act's policy statement, Gerard maintains that the Act limits a defendant's liability only if the plaintiff's injuries were "solely" caused by an inherent risk of equine activities. Section 27-1-725, MCA. Because Paws Up's conduct contributed to Reba's stumble, Gerard argues, his injuries were not solely caused by an inherent risk of equine activities and consequently Paws Up cannot avoid liability under the Act. Gerard asserts that he told Oglesby his saddle was tilting to the left but she did nothing in response; that Oglesby took the Girasoles on a newly cut, ill-defined trail; that rather than lead the ride single file Oglesby rode beside the Girasoles to train her "problem" horse; and that Reba repeatedly turned her head toward the barn, but Oglesby did not offer Gerard any instructions. Reasonable minds could differ about whether Reba's stumble was foreseeable, Gerard asserts, and therefore the District Court should not have made this determination as a matter of law. *See Fisher v. Swift Transp. Co., Inc.*, 2008 MT 105, ¶ 42, 342 Mont. 335, 181 P.3d 601 (citations omitted) ("[W]here reasonable minds may reach but one conclusion, foreseeability may be determined as a matter of law for summary judgment purposes.").

6

¶9     "The essential elements of a negligence claim are: (1) the existence of an applicable legal duty owed to the claimant; (2) breach of that duty; (3) causation of harm; and (4) resulting pecuniary damages." *Kostelecky v. Peas in a Pod LLC*, 2022 MT 195, ¶ 20, 410 Mont. 239, 518 P.3d 840 (citations omitted).  A plaintiff asserting a negligence claim must establish that the defendant owed the plaintiff a duty and must make "allegations which, if proven, would support a finding of a breach of the duty." *Mullee v. Winter Sports, Inc.*, 2025 MT 113, ¶ 14, 422 Mont. 180, 569 P.3d 594 (quoting *Peterson v. Eichhorn*, 2008 MT 250, ¶ 24, 344 Mont. 540, 189 P.3d 615).  "While negligence actions ordinarily involve factual issues which make summary judgment inappropriate, if the plaintiff fails to offer proof on any one of the four elements of negligence it is proper to enter summary judgment in favor of the defendant." *Mullee*, ¶ 14 (citation omitted).

¶10    The existence of a legal duty is a question of law to be determined by the court. *Mullee*, ¶ 18 (citation omitted).  "In determining whether duty exists, we consider whether imposing a duty comports with public policy and 'whether the defendant could have foreseen that his conduct could have resulted in an injury to the plaintiff.'" *Mullee*, ¶ 18 (quoting *Bassett v. Lamantia*, 2018 MT 119, ¶ 10, 391 Mont. 309, 417 P.3d 299).  Duty is therefore mainly a question of foreseeability. *Mullee*, ¶ 18 (citation omitted).  Any duty in this case "must be viewed in the unique context of [horseback riding]" and "through the lens of" the Equine Activities Act. *Mullee*, ¶ 15 (citations and internal quotations omitted).  The practical effect of the Equine Activities Act "is to pronounce that equine activity sponsors do not have a duty to protect participants from either unavoidable risks, or the

7

inherent risks of equine activities of which the participant is or should be aware." *McDermott v. Carie, LLC*, 2005 MT 293, ¶ 18, 329 Mont. 295, 124 P.3d 168. We held in *McDermott*, ¶ 18, that "so long as the participant expects a risk inherent in equine activities, pursuant to the statute, the equine activity sponsor may not be held liable for injury suffered as a result of that risk." The District Court recognized that a horse's stumble was a risk inherent in the activity of horseback riding. Concluding that none of the facts Gerard alleged "would cause a reasonable guide to anticipate or prevent the sudden, severe stumble that occurred[,]" the court held that "Reba's stumble was not foreseeable."

¶11 Gerard does not dispute that he was aware of the risk that a horseback ride at Paws Up could result in injury to a rider, including the possibility that a horse might stumble. The Agreement he signed warned that Paws Up activities, including equine activities, could lead to bodily injury, severe bodily injury, breaks, and trauma. The Agreement further referenced the inherent risk in "the propensity of an equine to behave in ways that may result in injury or harm to or the death of persons on or around the equine." *See* § 27-1-726(7)(a) and (b), MCA (defining "inherent risk" to include "the propensity of an equine to behave in ways that may result in injury or harm to . . . persons on or around the equine" and "the unpredictability of an equine's reaction to such things as medication; sounds; sudden movement; and unfamiliar objects, persons, or other animals."). Gerard therefore had notice that the horseback ride could cause him injury. *See McDermott*, ¶ 19 (holding that, though it could not immunize the defendant from liability, pre-tort release was admissible for purposes of demonstrating that plaintiff "had notice of the inherent risks

posed by the unpredictable nature of horses"). He maintains that, despite this understanding, he should not bear responsibility for his injuries because Paws Up's negligent acts and omissions contributed to Reba's stumble and therefore caused foreseeable injury to him.

¶12 We previously addressed whether a slipping saddle was an inherent risk under the Equine Activities Act. *Fishman v. GRBR, Inc.*, 2017 MT 245, ¶ 15, 389 Mont. 41, 403 P.3d 660. While Fishman rode around the corral, a wrangler noticed that he was leaning to one side, causing his saddle to shift. *Fishman*, ¶ 6. She instructed Fishman to shift his weight and to keep the saddle centered over the horse. *Fishman*, ¶ 6. During the ride, Fishman tried to re-center the saddle but fell off the horse and injured himself. *Fishman*, ¶ 7. Fishman sued, arguing that although the wrangler checked the tack before the ride, she never inspected or adjusted his saddle after noticing it was off-center. *Fishman*, ¶¶ 5, 8. We held that the fact the cinch still loosened despite the wrangler's efforts "underscore[d] that this occurrence is an inherent danger or condition of equine activity." *Fishman*, ¶ 15.

¶13 Oglesby testified that before Gerard mounted Reba, she "tightened the cinch, brought [Reba] over to the mounting block, tightened the cinch again, and then let Mr. Girasole hop on, and then checked the cinch again when [she] was checking stirrups." Gerard does not dispute that Oglesby checked the cinch before he mounted the horse; he asserts, though, that Oglesby merely told him to "shimmy" and failed to adjust the cinch after he mounted Reba. Like the wrangler in *Fishman*, ¶ 15, Oglesby repeatedly checked the cinch before Gerard mounted Reba—it was an inherent risk that his saddle might slip.

9

¶14    Gerard's expert, Linda Rubio, stated that there are dangers both to under- and overtightening the saddle's girth.[2] A loose saddle "has a great chance of slipping," but a girth that is too tight would be uncomfortable and painful for the horse. She said that tightening a girth is "a science as far as a professional wrangler horse person that does this for a living, and you just know the feel of it," and that it is "like a muscle memory science." Rubio's testimony further confirms that the imprecision of adjusting a saddle is an inherent risk of horseback riding. *See Cooperman v. David*, 214 F.3d 1162, 1168 (10th Cir. 2000) ("[B]ecause cinching a saddle is done by hand, and not with scientific precision, a provider must make a judgment call as to how tight or loose to cinch the saddle. This imprecision . . . is 'characteristic' or 'typical' of and therefore 'inherent in' the sport of horseback riding.").

¶15    In *Cooperman*, the plaintiff booked a horseback ride outside Pinedale, Wyoming. The group rode forty-five minutes to an hour and a half, took a lunch break, and then turned around. *Cooperman*, 214 F.3d at 1163. On the ride back to the corral, Cooperman's saddle slipped all the way under the horse's belly, causing Cooperman to fall off and injure his shoulder. *Cooperman*, 214 F.3d at 1163. In determining whether Cooperman's injuries resulted from a risk inherent in horseback riding—thereby foreclosing liability under Wyoming's Recreation Safety Act—the Tenth Circuit declined "to look at the risk in a vacuum, apart from the factual setting to which the rider was exposed." *Cooperman*,

---

[2] Although Oglesby and Rubio used different words to describe the act of adjusting a saddle ("cinch" and "girth"), this difference is inconsequential for purposes of determining whether adjusting a saddle is an inherent risk of horseback riding.

10

214 F.3d at 1167. The court illustrated how the duty question changes based on the alleged facts:

> For example, if the only fact presented to the court is that the horse bucked while the rider was properly sitting on the horse, we would frame the duty question as whether a bucking horse is an inherent risk of horseback riding. However, if the facts established that the owner of the horse lit firecrackers next to the horse and the horse bucked, we would ask whether a horse bucking when firecrackers are lit next to the horse is an inherent risk of horseback riding.

*Cooperman*, 214 F.3d at 1167. Applying this fact-specific approach to the question of inherent risk and considering that Cooperman's saddle hung loosely beneath the horse's belly after he fell, the issue was whether a loosely cinched saddle is an inherent risk of horseback riding. *Cooperman*, 214 F.3d at 1168. The court held that Cooperman did not meet his "burden of presenting some evidence on summary judgment that would raise a question of fact that the loosely cinched saddle was caused, not by an inherent risk, but rather by a risk that was atypical, uncharacteristic, not intrinsic to, and thus not inherent in, the recreational activity of horseback riding." *Cooperman*, 214 F.3d at 1169. *See also Dullmaier v. Xanterra Parks & Resorts*, 883 F.3d 1278, 1286 (10th Cir. 2018) (quoting *Kovnat v. Xanterra Parks & Resorts*, 770 F.3d 949, 955 (10th Cir. 2014)) ("The circumstances of each case control whether the question of inherent risk is to be decided by the court or by a jury.").

¶16 The equine activity sponsor's trail selection was at issue in *Loftin v. Lee*, 341 S.W.3d 352, 354 (Tex. 2011), where the two friends decided to ride horses starting on Loftin's property. Loftin chose a trail across a neighboring property that she knew could

be muddy. *Loftin*, 341 S.W.3d at 354. When they reached the muddy section of trail, Lee saw that it was muddy and that vines hung down overhead. *Loftin*, 341 S.W.3d at 354-55. Lee's horse, already spooked by the mud, bolted when a vine touched its flank, causing Lee to fall and fracture a vertebra. *Loftin*, 341 S.W.3d at 355. Lee sued her friend, arguing that Loftin's negligence in choosing a trail to ride caused her injuries. *Loftin*, 341 S.W.3d at 356.

¶17 On appeal before the Texas Supreme Court, Lee acknowledged the inherent risk of horseback riding that a horse will behave erratically in mud or when its flank is touched. *Loftin*, 341 S.W.3d at 357. Like Girasole, Lee insisted that "her injury resulted, not from her horse's propensities, but from having been put in a place where those propensities could cause harm." *Loftin*, 341 S.W.3d at 357. Because selecting a trail that may spook a horse with mud, vines, or other natural conditions is an inherent risk in horseback riding, the court rejected Lee's argument, holding that Texas's Equine Activity Limitation of Liability Act limited Loftin's liability. *Loftin*, 341 S.W.3d at 358-60.

¶18 Oglesby testified that she rode beside the Girasoles so she could observe and maintain a safe atmosphere. She stated that "[i]t's safer, because I can see everything that's going on when I'm riding out to the side" and that "[i]t's better for me to ride out to the side so I can see things and, you know, just maintain the safe atmosphere that we have." Paws Up's expert likewise opined that a "nose-to-tail" ride, where the wrangler is in the front of a single-file line, "is the most unsafe, least desirable formation for one Wrangler with a small group of riders, especially inexperienced riders" because the "Wrangler has

12

to be constantly turning around to observe the riders." The expert opined that if a wrangler instead rides beside a group—as Oglesby did—"the Wrangler is able to monitor both riders with a simple glance." With this side-by-side configuration, "the Wrangler can easily provide information about the directions for the trail, riding conditions, warnings and other necessary information as well as general conversation, while constantly monitoring the riders." Rubio, on the other hand, opined that "horses on guided trail rides being ridden by novice/beginner riders do well primarily when following another horse nose to tail . . . , while following the lead horse ridden by a professional guide/wrangler." Notwithstanding these divergent viewpoints, the differences are not material. Rubio's testimony did not indicate that Oglesby riding beside the group increased the risk or made it foreseeable that Reba would stumble. And Gerard offered no evidence that Oglesby's supposed "problem" horse did anything that startled the other horses or caused Reba to lose her footing.

¶19     As in *Loftin*, 341 S.W.3d at 358, it was an inherent risk of horseback riding that the trail Oglesby selected could cause a horse to spook, stumble, or bolt. The Act itself bolsters this conclusion, as it defines inherent risks to include "hazards, such as surface and subsurface ground conditions." Section 27-1-726(7)(c), MCA. If the trail Oglesby selected was hazardous simply because it was new and ill-defined—and not because it had a dangerous latent condition of which Paws Up knew or should have known, § 27-1-727(3)(a)(iii), MCA, which Gerard does not allege—these hazards were an inherent risk under § 27-1-726(7)(c), MCA. Similarly, Gerard does not point to evidence in the

13

record indicating that Reba's stumble was foreseeable because her behavior showed a desire to return to the barn during the group's brief, fifteen to thirty-minute ride. Although Gerard claims that Oglesby told the Girasoles the horses she initially selected for them were unavailable, he did not offer evidence to dispute Oglesby's testimony that Reba was a "good, easy, steady-going horse" that had been used for all kinds of riders, including children. He presented no evidence that the horse was not suited for a rider of his size and capabilities, that Reba showed any signs of distress, or that Oglesby's relative position to the Girasoles made it foreseeable to Paws Up that Reba might stumble.

¶20 Justice Shea's Dissent contends that Gerard alleged facts that could establish Oglesby acted with willful or wanton disregard for his safety, thereby raising a factual issue for trial. Dissent, ¶¶ 35, 41. *See* § 27-1-727(3)(a)(iv), MCA (providing the Act's liability limitation does not apply if equine activity sponsor "committed an act or omission that constituted willful or wanton disregard for the safety of the participant and the act or omission caused the injury."). The Dissent points to Gerard's assertion that he repeatedly told Oglesby Reba was agitated and uncooperative; to Oglesby's testimony that Reba never had had a problem looking back; and to Rubio's opinion that Oglesby's inattentiveness fell below the equine industry standard of care. Dissent, ¶ 36.

¶21 Although the Act does not define willful or wanton, "[w]illfully, when applied to the intent with which an act is done or omitted, means a purpose or willingness to commit the act or make the omission referred to." Section 1-1-204(5), MCA. We have described "wanton," which has no statutory definition, as synonymous with "reckless":

14

In *Wollaston v. Burlington Northern, Inc.*, we defined willful, wanton, or reckless conduct as an act for which "it is apparent, or reasonably should have been apparent, to the defendant that the result was likely to prove disastrous to the plaintiff, and [the defendant] acted with such indifference toward, or utter disregard of, such a consequence that it can be said he was willing to perpetuate it."

*Jobe v. City of Polson*, 2004 MT 183, ¶ 18, 322 Mont. 157, 94 P.3d 743 (quoting *Wollaston v. Burlington Northern, Inc.*, 188 Mont. 192, 198, 612 P.2d 1277, 1280 (1980)). *Jobe*, ¶ 21, applied the "willful or wanton" standard in Montana's Recreational Use Act, § 70-16-302(1), MCA. We reversed summary judgment for the City when the record raised disputed facts whether the City knew before Jobe's fall on a city dock of the broken plank and the dangers it presented, "and yet consciously delayed making the necessary repairs." *Jobe*, ¶ 20.

¶22 Contrary to Gerard's argument on appeal, the deposition testimony does not show that he "repeatedly" warned Oglesby of his difficulties with Reba. Gerard recalled asking Oglesby, "What's the deal here? This horse doesn't want to go," to which Oglesby responded that Reba likely was turning around because she was unfamiliar with the trail. Gerard testified that "[i]t happened—from the moment I said it to her, *within a short period of time*, the horse tripped, and I got a bad injury." (Emphasis added.) Even construing Gerard's testimony in his favor, it does not tend to show that Oglesby purposely or willingly ignored repeated complaints; he alerted Oglesby to Reba's behavior, Oglesby reassured him, and Reba soon tripped. These facts—an inexperienced rider telling a wrangler within fifteen to thirty minutes of starting a ride, that his horse was behaving unusually—do not rise to the level of willful or wanton disregard for the participant's

15

safety. Even if this was unusual behavior for Reba, the record cannot bear a conclusion that her looking back to the barn should have made it apparent that continuing on the trail ride "was likely to prove disastrous to the plaintiff, and [Oglesby] acted with such indifference toward, or utter disregard of, such a consequence that it can be said [s]he was willing to perpetuate it." *Jobe*, ¶ 18. Reba's behavior squarely falls within the Act's non-exclusive definition of inherent risks. Section 27-1-726(7)(b), MCA ("the unpredictability of an equine's reaction to such things as medication; sounds; sudden movement; and unfamiliar objects, persons, or other animals[.]"). Holding that Oglesby's approach to the situation could constitute willful or wanton disregard for Gerard's safety would frustrate the clear purpose of the Act—to safeguard an equine activity provider's liability from the inherently unpredictable behavior of a horse.

¶23    Justice Shea's Dissent takes issue with the Opinion's reference to Gerard's deposition testimony, arguing that the Court is weighing the testimony and resolving factual disputes. Dissent, ¶ 36. In the quoted testimony, however, Paws Up's counsel was questioning Gerard from his answers to interrogatories, which stated that "Plaintiff continued making the guide aware of his horse's agitation" after he told her there was "an issue" with the horse, as it did not "want to go." Counsel asked: "What did you do to continue making the guide aware of your horse's agitation?" Gerard responded:

> This all happened kind of quickly. It wasn't really a ride . . . . I was on a horse trying to think what was going on . . . . And what did I do? It happened — from the moment I said it to her, within a short period of time, the horse tripped, and I got a bad injury.

16

¶24 The Dissent's attempt to find a genuine issue of fact from the record fails. First, "[w]e have consistently held that, in opposing summary judgment, a party may not create genuine issues of material fact by contradicting his own sworn testimony." *Becker v. Rosebud Operating Servs.*, 2008 MT 285, ¶ 22, 345 Mont. 368, 191 P.3d 435 (citations omitted). Gerard's assertion that he "continued" to alert Oglesby of problems, contradicted by his deposition testimony, does not raise a factual dispute. Second, "[m]aterial issues of fact are identified by looking to the substantive law governing the proceedings." *Planned Parenthood of Mont. v. State*, 2025 MT 120, ¶ 66, 422 Mont. 241, 570 P.3d 51 (citations omitted). When, under the substantive law established in the Equine Activities Act, "reasonable minds cannot differ, questions of fact can be determined as a matter of law." *Henricksen v. State*, 2004 MT 20, ¶ 19, 319 Mont. 307, 84 P.3d 38 (citation omitted).

¶25 Two Wyoming cases illustrate when a horseback riding injury may be sufficiently foreseeable to withstand a summary judgment motion. In *Carden v. Kelly*, 175 F. Supp. 2d 1318, 1320 (D. Wyo. 2001), Carden booked a backcountry horseback ride in the Bridger-Teton National Forest. Carden claimed that after departing on the twelve to thirteen-mile ride, her horse repeatedly stumbled; that the wrangler did not instruct her how to handle the horse's behavior; that during a lunch break the horse would not stop and continued walking past the other riders; and that once the party reached their destination—an alpine lake—her horse was tired and reluctant to continue, but that the wrangler pushed the inexperienced riders "up a steep and rocky slope with no marked trail, in order to view a scenic lake on the other side of the peak." *Carden*, 175 F. Supp. 2d at 1320-21. Carden

was severely injured when her horse fell. *Carden*, 175 F. Supp. 2d at 1321. Carden sued, alleging negligence and gross negligence against the defendants. *Carden*, 175 F. Supp. 2d at 1321. The court denied the defendants' motion for summary judgment because whether the horse's fall was an inherent risk of the ride presented a genuine issue of material fact appropriate for a jury. *Carden*, 175 F. Supp. 2d at 1328-29.

¶26 In *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1098 (10th Cir. 2002), the Sapones booked a private horseback riding lesson at Grand Targhee Resort for their two young children, Sean and Daya. Towards the end of the ride, after the wrangler had unleashed the halter ropes, Daya's horse bolted for the stables, and Daya fell out of the saddle. *Sapone*, 308 F.3d at 1098. Her foot stuck in the stirrup, and the horse dragged Daya on the ground and struck her in the head with its foot. *Sapone*, 308 F.3d at 1098. The wrangler did not seek medical help for Daya; her parents only learned of the accident several days later. *Sapone*, 208 F.3d at 1099. The Sapones sued Grand Targhee Resort and presented evidence that the wrangler failed to provide the children with helmets, did not instruct the children on how to handle the horses, never held onto the horses' halter ropes during the ride, selected a horse that was too big for Daya, and selected a trail ride that was too dangerous for the children. *Sapone*, 208 F.3d at 1098, 1104. On appeal, the Tenth Circuit held that there were genuine issues of material fact concerning whether Grand Targhee gave adequate instructions and oversight to the children before the ride. *Sapone*, 208 F.3d at 1104.

¶27   In contrast, the evidence was not sufficient to withstand summary judgment in *Dullmaier*. Karl-Heinz Dullmaier booked a guided horseback ride in Yellowstone National Park that took twenty participants through a meadow and required crossing a creek in a single-file line over a bridge. *Dullmaier*, 883 F.3d at 1281. When the group approached the bridge, a few ducks flew out from underneath, causing the lead wrangler's horse to rear back and throw him to the ground. *Dullmaier*, 883 F.3d at 1282. From the front of the group, the wrangler's horse then turned around and bolted back down the line of horses. *Dullmaier*, 883 F.3d at 1282. This caused the remaining horses, including Dullmaier's, to scatter and gallop away from the bridge. *Dullmaier*, 883 F.3d at 1282. Despite a wrangler's efforts to stop Dullmaier's horse, Dullmaier fell off when the horse began galloping downhill. *Dullmaier*, 883 F.3d at 1283. He later died from his injuries. *Dullmaier*, 883 F.3d at 1283.

¶28   Dullmaier's wife brought a wrongful death action against Xanterra—the company that provided the ride—arguing on appeal that the company's failure to eliminate the risks that led to Dullmaier's death "introduced 'non-inherent hazards' that were 'substantial factors' in Mr. Dullmaier's death." *Dullmaier*, 883 F.3d at 1281, 1294. The Tenth Circuit reasoned that the "'substantial factors' Ms. Dullmaier identifie[d] [were] merely steps that Xanterra might have taken to minimize the ride's *inherent* risks." *Dullmaier*, 883 F.3d at 1294. The court held that Xanterra did not have an obligation to minimize the ride's inherent risks because Wyoming's Recreation Safety Act "expressly states that 'provider[s]' are 'not required to eliminate, alter, or control the inherent risks' within the

19

sport or recreational opportunity." *Dullmaier*, 883 F.3d at 1294 (quoting Wyo. Stat. Ann. § 1-1-123(b)) (citation omitted).

¶29    The Indiana Court of Appeals addressed a similar argument in *Perry v. Whitley Cnty. 4-H Clubs Inc.*, 931 N.E.2d 933 (Ind. App. 2010).  There, Perry was responsible for the children's safety at one of Whitley County 4-H Club's horse shows.  *Perry*, 931 N.E.2d at 935.  The Club usually held its competitions in a larger barn; for this competition, the horses were unfamiliar with the smaller barn that the Club selected.  *Perry*, 931 N.E.2d at 935.  Seven horses were led into the barn and lined up about two and one-half feet apart, then turned over to children who led the horses through a series of maneuvers.  *Perry*, 931 N.E.2d at 935.  Perry approached one of the horses when it became agitated, trying to prevent it from hurting a child.  *Perry*, 931 N.E.2d at 935.  The neighboring horse kicked Perry in the knee.  *Perry*, 931 N.E.2d at 935.

¶30    Perry sued the Club for negligence, arguing that the Club's decision to hold the competition in a cramped space unfamiliar to the horses negligently increased the risk that a horse would become agitated and kick her.  *Perry*, 931 N.E.2d at 940.  Under Indiana's Equine Activity Statute—that, like Montana's, defines inherent risks to include the unpredictability of a horse's reaction to various stimuli and its propensity to cause injury or harm—the court of appeals reasoned that Perry's injury was directly caused by the inherent risks of a horse's unpredictable reaction to other horses nearby and the unfamiliar environment of the small barn.  *Perry*, 931 N.E.2d at 938-40.  Even if the Club had negligently selected a cramped, unfamiliar space for the competition, its "conduct would

20

have contributed to Perry's injury only by heightening the already inherent risk that a horse might behave unpredictably and in an injury-causing manner." *Perry*, 931 N.E.2d at 940. Indiana's Equine Activity Statute barred Perry's claim because "her injury resulted from inherent risks of equine activities and the 4-H Club was negligent, if at all, only for failing to mitigate those inherent risks." *Perry*, 931 N.E.2d at 940-41.

¶31    These cases help illustrate why the summary judgment record in this case sustains the District Court's ruling.  The plaintiffs in *Sapone* and *Carden* presented specific facts that made their injuries foreseeable to the equine activity sponsors because the sponsors' actions introduced new risks or otherwise made the risk atypical or uncharacteristic.  In *Carden*, 175 F. Supp. 2d at 1321, for example, the horse repeatedly stumbled during the miles-long ride before the wrangler pushed the riders up a steep, rocky slope with no trail. Conversely here, Reba stumbled once, with no warning, only fifteen to thirty minutes into the Girasoles' short ride.  Unlike *Sapone*, 208 F.3d at 1098, 1104, Gerard does not allege that Paws Up failed entirely to instruct him before setting out or that Oglesby selected a horse inappropriately suited to his abilities.

¶32    Justice Shea takes issue with the reference to *Sapone* and *Carden*, arguing that "[t]he Court asserts that the facts in those cases were not as egregious as the facts in this case, but just because one injury is *very* foreseeable does not make another injury unforeseeable." Dissent, ¶ 39.  *Sapone* and *Carden*, however, do not simply present "more extreme cases," Dissent, ¶ 39, but illustrate non-inherent, atypical, or uncharacteristic risks that the equine service provider introduced to the equation.  Where instead the facts would support only

that the equine service provider may have failed to mitigate an already inherent risk of horseback riding, the plaintiff has not met his burden of demonstrating a genuine issue of material fact.

¶33 In the final analysis, even viewing the evidence in a light most favorable to the plaintiff, that Gerard's horse might stumble was an inherent risk of horseback riding. He alleges at most that Paws Up failed to minimize that already inherent risk by, for example, turning around when Reba began flipping her head, readjusting his saddle, or taking Reba on a different trail. Under our clear holding in *McDermott*, Paws Up had no duty to protect Gerard from the inherent risks of which he was or should have been aware. *McDermott*, ¶ 18. The injury is not foreseeable when it results from such an inherent risk. *See McDermott*, ¶ 18 ("so long as the participant expects a risk inherent in equine activities, pursuant to the statute, the equine activity sponsor *may not be held liable* for injury suffered as a result of that risk") (emphasis added). The Act's statement of policy does not expand its specific limitations to allow liability to attach in those circumstances. Reba's unpredictable reaction to an unfamiliar trail, an inexperienced rider, or an uncomfortable saddle are the types of dangers the Act expressly identifies as "inherent." Gerard did not provide evidence that Paws Up engaged in conduct that caused foreseeable injury to him by a risk that was "atypical, uncharacteristic, [or] not intrinsic to . . . the recreational activity of horseback riding." *Cooperman*, 214 F.3d at 1169. "[I]n the absence of foreseeability, there is no duty and in the absence of duty, there is no negligence." *Mullee*, ¶ 18 (quoting *Poole v. Poole*, 2000 MT 117, ¶ 20, 299 Mont. 435, 1 P.3d 936). Because Gerard's

evidence, viewed in a light most favorably to him and "through the lens of" the Equine Activities Act, does not establish a triable question of fact that Paws Up negligently caused him foreseeable injury, it is not sufficient to withstand summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment.").

## CONCLUSION

¶34 Under the undisputed material facts presented in the summary judgment record, we conclude that Gerard's injury resulted from inherent risks of horseback riding. The District Court's grant of summary judgment to Paws Up is therefore affirmed.

/S/ BETH BAKER

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ JIM RICE

Justice James Jeremiah Shea, dissenting.

¶35 Section 27-1-727(3)(a)(iv), MCA, permits liability where a plaintiff demonstrates that the defendant "committed an act or omission that constituted willful or wanton disregard for the safety of the participant and the act or omission caused the injury." Gerard asserts that Paws Up, specifically Oglesby, committed four acts that meet this standard:

   (1) Oglesby failed to heed Gerard's concerns about his saddle titling.

23

(2) Oglesby took Gerard on a trail that was poorly cut.

(3) Oglesby distracted Reba by riding alongside rather than in front of the group.

(4) Oglesby failed to heed the warning signs that Reba was distracted and failed to intervene.

In affirming the District Court, the Court makes the following determinations with respect to those four assertions:

(1) Saddle tilting is an inherent risk of riding for which the Equine Activities Act precludes liability.

(2) Trail conditions are also an inherent risk.

(3) Gerard did not provide sufficient evidence to create a dispute of material fact regarding how Oglesby's riding alongside caused Reba to trip.

(4) Gerard did not point to sufficient evidence in the record that Reba's behavior should have made it foreseeable to Oglesby that Reba might trip because Reba was distracted or that Oglesby's failure to act was willful or wanton.

I dissent because I disagree with the Court's final determination.

¶36    The Court asserts that the only evidence Gerard offered that Reba's stumble was foreseeable to Oglesby is that Reba flipped her head towards the barn "during the group's brief, fifteen to thirty-minute ride."[1]  Opinion, ¶ 19.  But Gerard points to several other facts in the record that a jury might find relevant to whether Reba's trip was foreseeable.

---

[1] The ride was scheduled for two hours; it only became a "brief, fifteen to thirty-minute ride" when Gerard stubbornly refused to continue riding with a fractured pelvis and spine.

24

Gerard asserts that he repeatedly told Oglesby that Reba was agitated and uncooperative. The Court asserts that the record "does not show that [Gerard] 'repeatedly' warned Oglesby" that Reba was agitated. Opinion, ¶ 22. In support of that assertion, the Court selectively culls two quotations from two separate documents: Plaintiff's Responses to Defendant's First Combined Discovery Requests ("Plaintiff's Interrogatory Response") and Gerard's deposition. *See* Opinion, ¶ 22. Using its first quotation from the Plaintiff's Interrogatory Response, the Court asserts that Gerard provided a single warning to Oglesby. Using its second quotation from the deposition, the Court asserts that Reba tripped "within a short period of time" of that single warning. But just five sentences after the quote from Plaintiff's Interrogatory Response upon which the Court relies, the response continues to state that Gerard "*continued* making the guide aware of his horse's agitation." As for Gerard's statement at his deposition that Reba stumbled "within a short period of time," that was Gerard's response to a question about whether he could have ended the ride. For proper context, Gerard continued: "So you keep going about what I could have done. Yeah I could have gotten off the horse, yes. But [Oglesby] could also have come over and done what she's supposed to do and take care of me . . . she didn't even pay attention to me." The Court ignores the full context of both Plaintiff's Interrogatory Response and Gerard's deposition testimony—turning the summary judgment standard on its head by viewing the evidence in the light most favorable to the moving party and drawing all reasonable inferences in favor of the party seeking summary judgment.

¶37 Gerard also notes that his expert, Rubio, opined that "Reba's unusual behaviors on the Girasole ride should have put the guide on notice of issues that should have been addressed." Specifically, Rubio opined in her report that Oglesby's "inattention to . . . the problems that Dr. Gerard was having trying to ride and control Reba were fundamentally well below the Standard of Care in the Equine Industry expected from a reasonably prudent Trail Guide." In support of her formulation of the standard of care, Rubio cited to Paws Up's own training manual, which stated at page 30: "On the trail, you should continually look back at your guests to ensure that everything is okay. If a guest is having a problem, stop the ride and help them." Rubio noted that Oglesby testified in her deposition that Reba had never had a "problem looking back" that she was aware of, indicating that Reba looking back during the ride was unusual behavior that was cause for concern.

¶38 The District Court considered many of these facts in its determination that "Reba's stumble was not foreseeable." But in doing so, it usurped the role of the jury in weighing the facts before it. Causation, including foreseeability, is a question of fact for the trier of fact that may be determined as a matter of law only "where reasonable minds can reach but one conclusion." *Riley v. Am. Honda Motor Co.*, 259 Mont. 128, 132, 856 P.2d 196, 198 (1993). Gerard's evidence that Reba's stumble was foreseeable to Oglesby, including Paws Up's own manual, Rubio's expert testimony, Gerard's account of his warnings to Oglesby, and Oglesby's own testimony that Reba did not usually behave as she did that day, is precisely the sort of evidence that might cause reasonable minds to differ on the question of foreseeability. Whether or not a jury may ultimately find that Oglesby's failure

26

to respond to Gerard's repeated complaints about Reba's unusual, distracted behavior made the subsequent stumble and resulting injuries foreseeable, it is nevertheless a factual determination that is not susceptible to summary judgment. *See* Opinion, ¶ 5 ("All reasonable inferences that may be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment.") (quoting *Baumgart*, ¶ 14).

¶39    To support its determination that Gerard's foreseeability evidence does not meet his low burden, the Court relies on two cases out of Wyoming: *Sapone* and *Carden*. But the courts in both of those cases determined that the plaintiffs *had* met their burden to demonstrate a material dispute of fact on the question of foreseeability. *See Carden*, 175 F. Supp. 2d at 1329; *Sapone*, 208 F.3d at 1105. The Court asserts that the facts in those cases were not as egregious as the facts in this case, but just because one injury is *very* foreseeable does not make another injury unforeseeable. That's like saying we can decide as a matter of law that a wreck caused by a driver with a .07 BAC was not foreseeable because a Wyoming court held that a wreck caused by a driver with a .14 BAC was foreseeable. By comparing the facts of this case to the facts of more extreme cases, the Court is implicitly weighing the facts of this case and substituting its judgment for that of the jury. In doing so, the Court repeats the error of the District Court, which also relied on a comparison with *Carden* and determined that the less egregious facts of this case did not support a foreseeability determination. But the relevant determination is not whether the facts of this case are as bad as another case, or whether the facts of this case necessarily mean the injury was foreseeable; it is whether a reasonable jury *could* find that Reba's

stumble was foreseeable when viewing the facts in the record in the light most favorable to Gerard.

¶40 The Court repeats its weighing of the facts to reach the conclusion that Oglesby's failure to act was not willful or wanton. The Court asserts that the facts "cannot bear a conclusion that [Reba] looking back to the barn should have made it apparent that" that failing to act "'was likely to prove disastrous to the plaintiff, and [Oglesby] acted with such indifference toward, or utter disregard of, such a consequence that it can be said [s]he was willing to perpetuate it.'" Opinion, ¶ 22 (quoting *Jobe*, ¶ 18). But it was not only Reba's "looking back" that might have obligated Oglesby to act. It was her training, as evidenced by Paws Up's manual, Gerard's warnings, repeated or otherwise, and Oglesby's knowledge of Reba's past behavior. Indeed, Rubio directly opined that Oglesby's "inattention to . . . the problems that Dr. Gerard was having trying to ride and control Reba were fundamentally well below the Standard of Care in the Equine Industry expected from a reasonably prudent Trail Guide." By continuing to ignore certain facts, diminishing others, and focusing solely on Reba's behavior, the Court once again usurps the role of the jury, and makes itself the arbiter of both law and fact.

¶41 We have often said that "[s]ummary judgment is an extreme remedy that should be granted only when there is *no* genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Missoula Elec. Coop. v. Jon Cruson, Inc.*, 2016 MT 267, ¶ 15, 385 Mont. 200, 383 P.3d 210 (emphasis added). No doubt the Equine Activities Act was passed with the intention of limiting liability. But there is also no doubt that the

28

Legislature intended to preserve liability for certain acts and omissions that constitute "willful or wanton disregard for the safety of the participant." Section 27-1-727(3)(a)(iv), MCA. The Court asserts that Reba's behavior and Oglesby's responses to that behavior fall squarely within the Act's intended purpose—"to safeguard an equine activity provider's liability from the inherently unpredictable behavior of a horse." Opinion, ¶ 22. But to reach that conclusion, the Court must first ignore credible evidence that Reba's behavior in this instance *was* predictable based on Gerard's warnings, Oglesby's training, and Reba's deviation from past behavior. By announcing that Gerard's evidence is categorically insufficient to make Reba's stumble foreseeable, the Court today alters the usual threshold for negligence, creating a new, nebulous, higher bar for plaintiffs bringing claims under this Act.

¶42    "Summary judgment is an extreme remedy and should never be substituted for trial if a material factual controversy exists." *Spinler v. Allen*, 1999 MT 160, ¶ 16, 295 Mont. 139, 983 P.2d 348. The evidence in the record must be viewed in the light most favorable to the nonmoving party, and all reasonable inferences are to be drawn therefrom in favor of the party opposing summary judgment. *Our Lady of the Rockies, Inc. v. Peterson,* 2008 MT 110, ¶ 14, 342 Mont. 393, 181 P.3d 631. It is not the function of this Court to selectively emphasize parts of the record that support summary judgment and ignore those that do not. Whether or not Gerard's case might have carried the day with a jury, it was nevertheless a case for the jury—not this Court. I dissent.

/S/ JAMES JEREMIAH SHEA

Justices Ingrid Gustafson and Katherine Bidegaray join in the dissenting Opinion of Justice James Jeremiah Shea.

/S/ INGRID GUSTAFSON
/S/ KATHERINE M BIDEGARAY

Justice Katherine Bidegaray, dissenting.

¶43   I agree with the Dissent that the District Court erred in granting summary judgment and that these fact disputes should go to a jury.  I write separately to underscore what I view as the statute's controlling language and how the Act's structure requires that this case be decided by a jury.

¶44   The Legislature set out two coordinated policies:

> It is the policy of the state of Montana that a person is not liable for damages sustained by another *solely* as a result of risks inherent in equine activities . . . [*and*] [i]t is the policy . . . that an equine activity sponsor or equine professional who is negligent and causes foreseeable injury to a participant bears responsibility for that injury in accordance with other applicable law.

Section 27-1-725, MCA (emphasis added).

¶45   The Legislature's choice of the word "solely" is significant.  Immunity applies only when an inherent risk is the exclusive cause of the injury.  When negligence is also a causal factor, the statute preserves ordinary negligence principles.  Giving full meaning to "solely" ensures that both policy statements operate in harmony, maintaining the balance the Legislature struck between protecting equine providers from liability for unavoidable risks and holding them to account for preventable harm.  Therefore, when injury results

30

from an inherent risk combined with an equine professional's negligence, the statute directs that ordinary negligence principles apply.

¶46    Section 27-1-727(3)(a), MCA, lists exceptions where immunity never applies. These enumerated exceptions are not an exhaustive statement of when negligence may coexist with an inherent risk; rather, they illuminate the Legislature's intent but do not displace the broader limitation of § 27-1-725, MCA.  Reading the two provisions together, as we must, avoids rendering any part of the Act surplusage.  *See Gulbrandson v. Carey*, 272 Mont. 494, 500, 901 P.2d 573, 577 (1995).  To read § 27-1-727, MCA, as the exclusive measure of liability, without giving effect to the "solely" clause in § 27-1-725, MCA, disregards the Legislature's chosen structure and violates the interpretive rule that statutes must be construed to give effect to all provisions, if possible.[1]

¶47    The record contains evidence from which a jury could conclude that Dr. Girasole's injuries were not "solely" the result of an unavoidable stumble but also stemmed from preventable negligence—such as not including a cinch check in the pre-ride preparation, not re-cinching the saddle after he reported imbalance, starting the ride on a newly cut and ill-defined trail, placing a novice guest at the front, and disregarding repeated concerns about the horse's behavior.  These are not abstract disagreements; they are fact disputes that go directly to the statutory threshold.

---

[1] "In the construction of a statute, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted.  Where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all."  Section 1-2-101, MCA.

31

¶48 Determining whether a risk is "inherent" should be done with as much factual specificity as the record allows. *Cooperman v. David*, 214 F.3d 1162, 1167 (10th Cir. 2000). The question is not simply whether horses can stumble, but whether this stumble—in these conditions—was unavoidable despite reasonable care. This question is for the jury.

¶49 Applying § 27-1-725, MCA, as written means recognizing that immunity is not absolute. On this record, reasonable minds could differ on whether the inherent risk was the sole cause of the injury. That determination belongs to the jury. For these reasons, summary judgment should be reversed.

/S/ KATHERINE M BIDEGARAY

Justices James Jeremiah Shea and Ingrid Gustafson join in the dissenting Opinion of Justice Katherine Bidegaray.

/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON